ROBERT R. KRILICH, Plaintiff and Counterdefendant-Appellee, v. AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant-Appellant (Bongi Development Corporation, Defendant and Counterplaintiff-Appellant).—ROBERT R. KRILICH, Plaintiff and Counterdefendant-Appellee, v. AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant-Appellant (Bongi Development Corporation, Defendant and Counterplaintiff-Appellant).—ROBERT R. KRILICH, Plaintiff and Counterdefendant-Appellee and Third-Party Plaintiff-Appellant, v. AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant-Appellant (Bongi Development Corporation, Defendant and Counterplaintiff-Appellant; Viola Lorentz, as Adm'r of the Estate of Arthur Lorentz, et al., Third-Party Defendants-Appellees).

Second District   Nos. 2—01—0921, 2—01—1235, 2—01—1439 cons.

Opinion filed October 10, 2002.

O'MALLEY, J., specially concurring in part and dissenting in part.

Kenneth D. Hubbard and Michael T. Navigato, both of Laraia & Hubbard, P.C., of Wheaton, for appellants American National Bank & Trust Company and Bongi Development Corporation.

Edmund P. Boland and Michael J. Murray, both of Carey, Filter, White & Boland, of Chicago, for appellees Maurice Frishman, John Joyce, William Lange, Herbert Maier, Gene Nauert, and Edward M. White.

Keith E. Roberts, Jr., Michelle L. Cue, and Rosemarie Frontzak, all of Roberts & Vess, P.C., of Wheaton, for appellee Mary Burke.

Phillip A. Luetkehans, Bruce E. Garner, and Brian J. Armstrong, all of Schirott & Luetkehans, of Itasca, for Robert R. Krilich.

JUSTICE BYRNE delivered the opinion of the court:

These consolidated appeals arise from a real estate contract between plaintiff, Robert R. Krilich, and defendant Bongi Development Corporation (Bongi). Krilich filed two motions to dismiss Bongi's multiple counterclaims and affirmative defenses, the trial court granted the motions, and Bongi appeals the dismissals. Krilich appeals an unrelated order in which the trial court dismissed his claim for indemnification against his former joint venturers. We affirm.

## FACTS

On January 5, 1973, Krilich entered into a joint venture agreement (the Carol Stream Joint Venture Agreement) with Arthur Lorentz, Mary Burke, Gene Nauert, Herbert Maier, Maurice Frishman, John Joyce, William Lange, and Edward M. White (collectively, the joint venturers). The purpose of the joint venture was to purchase and develop residential real estate.

On June 29, 1988, acting on behalf of the joint venture, Krilich agreed to sell Bongi certain property in the Village of North Barrington for $1,237,500. The North Barrington parcel consisted of 15 lots of a subdivision, and the parties intended for Bongi to build a single-family residence on each lot. Pursuant to the North Barrington contract, Bongi was to pay Krilich $900,000 at closing and pay the remaining $337,500 pursuant to a promissory note. The contract further provides in relevant part:

"WHEREAS, [Bongi] intends to complete the zoning of the Subdivision by the Village at [Bongi's] sole cost and expense to enable [Bongi] to construct single-family residences.

\* \* \*

8. *Conditions Precedent.* [Bongi's] obligation to consummate the Purchase of the Property shall be contingent upon fulfillment of the following conditions precedent ('Conditions Precedent') hereinafter described:

a. *Tests and Inspections.* Within ten (10) days from the date hereof, [Krilich] shall deliver to [Bongi] all soil test borings, engineering studies, toxicity tests or other documentation that [Krilich] may have relating to the Property and if complete, [Bongi] shall have twenty (20) days from the date hereof to determine the acceptability of such reports. In the event the results of such tests and studies disclose that the Property is not suitable to permit the construction of improvements on the Property in accordance with [Bongi's] Intended Development, then upon written notice to [Krilich] within said twenty (20) day period, [Bongi] may terminate this Agreement. Thereafter, this Agreement shall be null and void and the parties shall have no further rights or liabilities hereunder. [Bongi's] failure to so notify [Krilich] in writing within said twenty (20) day period shall be construed as meaning that [Bongi] is conclusively satisfied with the results of the tests received by [Bongi] from [Krilich] and waives its right under this paragraph to terminate this Agreement.

b. *Final Approval.* [Bongi's] Intended Development will require adoption by the Village of an ordinance approving the subdivision of the Subdivision into fifteen (15) lots; the final ap-

proval of [Bongi's] engineering plans for the Subdivision, and approval by all staff members and Village committees of a Development Plan materially consistent with the Preliminary Development Plan; and [Bongi] receiving all necessary approvals and permits from all units of government having jurisdiction over the Property \*\*\*. The aforesaid approval process is hereinafter referred to as 'Final Approval.' [Bongi] shall file applications for Final Approval as soon as practicable and will thereafter diligently and in good faith take the steps necessary for consideration by the Village and other units of government having jurisdiction over the Property of a grant of such approval."

On July 15, 1988, Krilich and Bongi closed the sale and Bongi executed a $337,500 promissory note as planned. On or about that date, Krilich and Bongi modified the North Barrington contract to require Krilich to pay one-half of the cost of soil importations and certain other corrective measures. The parties also renewed the first promissory note in the form of a second note.

On February 8, 1991, Krilich and Bongi executed a second modification of the North Barrington contract and a third promissory note. The second modification voided the first modification, thereby eliminating Krilich's duty to pay the costs described therein. The third note consolidated the principal and the interest that Bongi owed and increased the interest rate.

On August 10, 1998, Krilich sued defendants Bongi and American National Bank and Trust Company (American) for breach of the third promissory note. On January 13, 1999, Bongi filed an answer, affirmative defenses, and three counterclaims. Bongi's original counterclaims state causes of action for misrepresentation, fraud, and breach of contract. In each of the counterclaims, Bongi alleges the following:

"In said Contract and during and after negotiations, KRILICH misrepresented the following material facts to BONGI:

(A) That on said real estate as set forth in the [NORTH] BARRINGTON CONTRACT, BONGI could construct fifteen (15) single family residences;

(B) That the real estate constituting the purchase was of a size sufficient to create individual septic fields for each of fifteen (15) lots and further that the content, quality, consistency and capacity of the soil was suitable for the construction of septic fields sufficient for the construction of fifteen (15) single family residences.

(C) That subdivision and other approvals from the Village of North Barrington, the County of Lake and other governmental bodies would be a routine matter and could be completed within a period of several months after closing."

The counterclaims further allege that Krilich intentionally deceived Bongi, Bongi reasonably relied upon the statements, and Bongi incurred substantial damages when it could not obtain zoning approval for the project. Bongi's pleadings also allege that Krilich failed to pay the amounts due under the first contract modification.

On March 30, 1999, Krilich filed a motion to dismiss the misrepresentation and fraud counterclaims under section 2—619 of the Code of Civil Procedure (Code) (735 ILCS 5/2—619 (West 1998)). Krilich conceded that he made the statements as alleged. However, he argued that Bongi unreasonably relied upon the statements because (1) they were statements of law, (2) they were statements of future facts, and (3) Bongi waived its contractual right to cancel the agreement upon the occurrence of the events that allegedly caused Bongi's damages. On June 8, 1999, Judge Austin granted the motion to dismiss the misrepresentation and fraud counterclaims.

More than a year later, Bongi filed two additional affirmative defenses, alleging that (1) the North Barrington contract was unenforceable because Krilich used duress and business compulsion while negotiating the second modification of the original agreement and (2) Bongi was entitled to a setoff against any amount that Krilich might recover because Krilich had breached the first contract modification. Bongi also amended the counterclaims to include a second breach of contract count based on the duress allegation.

Specifically, Bongi alleges that Krilich employed duress and business compulsion during the negotiations of the second contract modification by threatening to breach the parties' Covington Cove contract, an unrelated residential real estate development contract executed on May 18, 1988. Pursuant to the Covington Cove contract, Krilich was to sell Bongi 153 "fully improved lots" in the Village of Carol Stream. The agreement required Krilich to complete certain public subdivision improvements, and Bongi alleges that Krilich coerced Carl Bongiovanni, Bongi's president, to execute the second modification of the North Barrington contract by delaying completion of the improvements and withholding a letter of credit for the Covington Cove project. Bongi contends that Krilich knew that Bongi owed more than $5 million on outstanding mortgage loans on the Covington Cove project and that any delays in the construction would threaten the project. Bongi seeks at least $5 million on the duress counterclaim.

Krilich filed a motion to dismiss the two new affirmative defenses and the new counterclaim. The motion contained an affidavit prepared by Dennis Taheny, Krilich's former attorney, in which he stated that, on November 12, 1990, Taheny sent Bongiovanni and his attorney, Keith Wenk, a draft of the proposed second modification of the North Barrington contract.

On June 13, 2001, Judge Moy granted the motion, concluding that Bongi had failed to state a claim of duress because (1) Bongiovanni had the benefit of counsel during the three-month negotiation of the second modification, (2) a mere threat to breach a contract is not economic duress, and (3) public policy considerations supported the dismissal of the duress allegations. Bongi timely filed a notice of appeal, and we docketed the case under appeal No. 2—01—0921. Bongi subsequently filed a second proper notice of appeal of the dismissal of the misrepresentation and fraud counterclaims, and we docketed the case under appeal No. 2—01—1235.

On March 26, 2001, Krilich filed a third-party complaint in which he alleged that the joint venture agreement required the remaining joint venturers to indemnify him for any liability he might incur on behalf of the joint venture as a result of his litigation against Bongi. Pursuant to section 2—619 of the Code, the joint venturers filed a motion to dismiss Krilich's third-party complaint for indemnification. On November 20, 2001, Judge Webster granted the motion, concluding that the joint venturers' contractual duty to indemnify Krilich for Bongi's counterclaims was terminated by a mutual release that the parties executed before Bongi filed the counterclaims. Krilich timely appeals the dismissal in appeal No. 2—01—1439.

### BONGI'S MISREPRESENTATION AND FRAUD COUNTERCLAIMS (APPEAL No. 2—01—1235)

We initially address Bongi's appeal from Judge Austin's June 8, 1999, order granting Krilich's section 2—619 motion to dismiss Bongi's original misrepresentation and fraud counterclaims. Bongi argues that Judge Austin erroneously concluded that Krilich's misrepresentations were statements of law and statements that concerned future matters. Bongi additionally argues that it did not waive the issue by foregoing its right to terminate the contract. As he did in the trial court, Krilich concedes that he made the alleged statements, but he argues that they were statements of law and statements of future facts. Krilich further contends that Bongi waived its contractual right to terminate the agreement before closing. We agree with Krilich's waiver argument.

■ Krilich's motion to dismiss merely cites "section 2—619" of the Code, but it appears that the parties and the trial court analyzed the issues pursuant to subsection 2—619(a)(9). Our standard of review of a motion to dismiss under section 2—619 of the Code is *de novo. Neppl v. Murphy*, 316 Ill. App. 3d 581, 583 (2000). A section 2—619 motion to dismiss admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that appear on the face

of the complaint or are established by external submissions that act to defeat the claim. *Neppl*, 316 Ill. App. 3d at 584.

A section 2—619 proceeding permits a dismissal after the trial court considers issues of law or easily proved issues of fact. *Neppl*, 316 Ill. App. 3d at 585. Section 2—619(a)(9), in particular, allows dismissal when "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2—619(a)(9) (West 2000). The term "affirmative matter" as used in section 2—619(a)(9) has been defined as a type of defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint. *Neppl*, 316 Ill. App. 3d at 585.

In ruling on a motion to dismiss under section 2—619, the trial court may consider pleadings, depositions, and affidavits. *Zedella v. Gibson*, 165 Ill. 2d 181, 185 (1995). The question on appeal is " 'whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " *Zedella*, 165 Ill. 2d at 185-86, quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993).

■ It is well settled that, to state a cause of action for misrepresentation and fraud, a party must plead and prove the following elements: (1) the existence of a false statement of material fact, (2) made by a party who knows or believes it to be false, (3) with the intent to induce another to act, (4) which causes action by another in reasonable reliance on the statement's truth, and (5) causes an injury to the other resulting from the reliance. *Tan v. Boyke*, 156 Ill. App. 3d 49, 54 (1987).

In the counterclaims, Bongi alleges that Krilich misrepresented that (1) Bongi could construct 15 single-family residences on the lots, (2) each lot was sufficiently large and the soil was adequate to support a septic field, and (3) Bongi could easily obtain subdivision and other zoning approvals within several months of the closing. We note preliminarily that the first and third statements are substantively similar: they both relate to the ease with which Bongi could obtain zoning approval, which was the primary obstacle to the completion of the project.

The North Barrington contract required Krilich to provide Bongi with copies of all zoning ordinances and permits relating to the property within five days of the contract. Krilich was further required to disclose within 10 days of the contract all soil test borings, engineering studies, toxicity tests and other documentation.

The contract gave Bongi the right to terminate the contract within 10 days if Bongi alone concluded that the zoning restrictions would unduly hinder construction. Although the contract did not expressly provide Bongi with the right to conduct independent inspections or tests, Bongi had 20 days to review the soil reports and determine whether the property was suitable for construction of the residences. Bongi argues that, because the zoning approval process did not begin until after the closing, it had no way of knowing whether Krilich's statements were true. However, Bongi concedes that it knew the nature of the zoning restrictions when the sale was closed. Bongi disputes the existence of the soil test reports and insists that it was required to proceed to closing even if Krilich failed to deliver them.

■ Bongi's review of and acquiescence to the zoning ordinances and the soil reports were conditions precedent to its duty to perform under the contract. Krilich was in no better position than Bongi, a sophisticated residential real estate developer, to assess the potential for septic system construction and the likelihood of prompt zoning approval. We agree with the trial court that Bongi unreasonably relied upon Krilich's overly optimistic view of both situations. If Bongi was uncertain whether the zoning approval would be forthcoming, it could have terminated the contract before closing. Bongi also had the right to terminate the agreement if Krilich failed to tender the soil reports as required. Because Bongi proceeded to closing without objection, it waived its right to terminate the contract. We conclude that Bongi's misrepresentation and fraud counterclaims should be dismissed based on the waiver, and we need not address whether the alleged misrepresentations were statements of law or future facts.

BONGI'S DURESS ALLEGATIONS (APPEAL No. 2—01—0921)

Bongi next appeals Judge Moy's dismissal of its amended counterclaim and affirmative defenses alleging that Krilich used duress and business compulsion to secure the second modification of the North Barrington contract. In his motion, Krilich merely cited section "2—619" of the Code, but the parties agree that the motion was analyzed under subsection 2—619(a)(9). Bongi initially argues that a reversal is required because Krilich should have filed his motion under section 2—615 of the Code. Bongi also contends that issues of fact precluded the trial court from granting the motion. We disagree with both arguments and conclude that the court correctly decided the motion under section 2—619(a)(9).

■ Our standard of review of a motion to dismiss, under either section 2—615 or 2—619 of the Code, is de novo. Neppl, 316 Ill. App. 3d at 583. A motion to dismiss based on section 2—615 admits all

well-pleaded facts and attacks the legal sufficiency of the complaint; but a motion to dismiss under section 2—619 admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that appear on the face of the complaint or are established by external submissions that act to defeat the claim. *Neppl*, 316 Ill. App. 3d at 584.

■ If the grounds for dismissal do not appear on the face of the pleading attacked, the party seeking the dismissal must file an affidavit in support of the motion. 735 ILCS 5/2—619(a) (West 2000). If facts set forth in an affidavit supporting a motion to dismiss are not contradicted by a counteraffidavit, they will be taken as true notwithstanding contrary unsupported allegations in the complaint. *Pryweller v. Cohen*, 282 Ill. App. 3d 899, 907 (1996).

■ Economic duress, also known as business compulsion, is an affirmative defense to a contract, which releases the party signing under duress from all contractual obligations. *Herget National Bank of Pekin v. Theede*, 181 Ill. App. 3d 1053, 1057 (1989). Duress occurs where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of one's own free will. *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 91 (1999). To establish duress, one must demonstrate that the threat has left the individual " 'bereft of the quality of mind essential to the making of a contract.' " *Hurd*, 303 Ill. App. 3d at 91, quoting *Alexander v. Standard Oil Co.*, 97 Ill. App. 3d 809, 815 (1981). The acts or threats complained of must be wrongful; however, the term "wrongful" is not limited to acts that are criminal, tortious, or in violation of a contractual duty. They must extend to acts that are also wrongful in a moral sense. *Hurd*, 303 Ill. App. 3d at 91.

■ It is well settled that, where consent to an agreement is secured merely through hard bargaining positions or financial pressures, economic duress does not exist. *Hurd*, 303 Ill. App. 3d at 91. "Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated on the basis of duress." *Alexander*, 97 Ill. App. 3d at 815.

"Ordinarily, a threat to break a contract does not constitute duress, and to infer duress, there must be some probable consequences of the threat for which the remedy for the breach afforded by the courts is inadequate. If there is no full and adequate remedy from the courts for the breach, the coercive effect of the threatened action may be inferred." *Kaplan v. Keith*, 60 Ill. App. 3d 804, 807 (1978). Furthermore, a finding of duress is less likely if the party has the as-

sistance of counsel and adequate time to consider the proposed contractual terms. *Alexander*, 97 Ill. App. 3d at 816.

In this case, Bongi alleges that Krilich threatened to breach the Covington Cove contract if Bongiovanni did not execute the second modification of the North Barrington contract. In his section 2—619(a)(9) motion to dismiss, Krilich included Taheny's affidavit, which states that Wenk, Bongi's attorney, knew of Krilich's proposal during the entire three-month negotiation period. Taheny did not state that Wenk was personally involved in the negotiations, but Bongi did not allege in any pleading, deposition, or counteraffidavit that it did not consult Wenk during that period. Our review of the record reveals that Wenk clearly knew of the negotiations and that Bongiovanni had the opportunity to consult him.

■ Bongi argues that a duress allegation may never be dismissed under section 2—619 of the Code because a finding of duress turns on the subjective feelings of the parties. However, the appellate court has frequently held that a claim of duress may be disposed of without an evidentiary hearing. See, *e.g.*, *Hurd*, 303 Ill. App. 3d at 88 (granting motion to dismiss under sections 2—619(a)(6) and 2—619(a)(9)); *Alexander*, 97 Ill. App. 3d at 816 (granting summary judgment). Contrary to Bongi's assertions, we conclude that Taheny's affidavit is the type of affirmative matter that supports a section 2—619(a)(9) motion to dismiss because Bongi's pleadings do not contradict the affidavit.

■ Bongi next argues that Krilich's threat to breach the contract was coercive because Bongi would not have had a "full and adequate" judicial remedy. However, Bongi merely contends that it and Bongiovanni faced "financial collapse," bankruptcy, and protracted litigation if Krilich followed through on his threat. We acknowledge that Bongi's damages would have been substantial, but we disagree with Bongi that all of the consequential and incidental damages of Krilich's threatened breach could not have been recovered through judicial proceedings. Moreover, Bongi cites no authority for its proposition that the inconvenience associated with an adversary's contract breach renders a judicial remedy inadequate. Because Bongiovanni enjoyed access to legal counsel during the three-month negotiation period and because Bongi had an adequate potential judicial remedy, we conclude that the trial court correctly dismissed the affirmative defenses and counterclaim alleging economic duress.

Our review of a dismissal under section 2—619(a)(9) of the Code is *de novo* (*Neppl*, 316 Ill. App. 3d at 583), and we may affirm the result below on any basis that is supported by the record (*In re Application*

*of the Cook County Treasurer*, 185 Ill. 2d 428, 436 (1998)). Therefore, we need not consider whether the trial court erroneously relied upon public policy considerations in reaching its decision.

## KRILICH'S INDEMNIFICATION CLAIM
### (APPEAL No. 2—01—1439)

Finally, we address Krilich's appeal in which he challenges Judge Webster's November 20, 2001, order dismissing Krilich's third-party complaint seeking indemnification from the joint venturers. The joint venture agreement provides in relevant part:

"10. In the event that any party shall be required to make payment of an indebtedness of the Joint Venture, the others shall indemnify him against any loss by virtue thereof in proportion to their ownership interest in the Joint Venture."

Several of the joint venturers sued Krilich for an accounting of the Carol Stream joint venture, and on September 24, 1998, Krilich and all of the joint venturers filed in the circuit court a mutual release to dissolve the joint venture and settle the claims. The mutual release provides in relevant part:

"2. The entry of the [September 24, 1998,] Order and distribution of the sums provided therein and acceptance of same shall operate as a complete release by each partner of all claims against the partnership and any other partner in connection with the affairs of the partnership, except to the extent hereinafter set forth, and each partner by execution of this agreement releases and discharges each other partner and the partnership from all claims, demands and causes of action either may have against the other or the partnership arising out of any matter involving said partnership or payments made by said partnership or funds received by said partnership or other transactions involving the partnership from the inception of the partnership to the date hereof, except as set forth hereinafter.

\* \* \*

6. Nothing herein contained shall be deemed to affect the rights of the partners, each against the other, to contribution for any sums due the partnership by virtue of possible claims by the Village of Carol Stream and Parkway Bank in connection with financing obtained by the partnership or Robert Krilich on behalf of the partnership. Each partner shall refund to the partnership out of sums received by him his proportional shares of any monies necessary to meet liabilities of the partnership."

A release is a contract and, as such, is subject to the traditional rules of contract interpretation. *Doctor's Associates Inc. v. Duree*, 319 Ill. App. 3d 1032, 1045 (2001). A court must construe the meaning of a

contract by examining the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning. Furthermore, the court must place the meanings of words within the context of the contract as a whole. A contract is ambiguous when its terms may reasonably be interpreted in more than one way. The mere fact that the parties disagree on some term, however, does not render the term ambiguous. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990).

Here, Bongi's counterclaims arose from joint venture transactions occurring before the mutual release was executed. However, Bongi did not present its first counterclaims until January 13, 1999, which was nearly four months after the mutual release was filed in the circuit court. Krilich argues that the final sentence of paragraph 6 of the mutual release imposed a duty on each joint venturer to indemnify the joint venture for *any* claim presented after the release was executed, even if the events supporting the claim occurred before the release was executed. We disagree.

The plain language of paragraph 2 of the mutual release generally extinguished the joint venturers' obligation to indemnify one another for claims that "may" exist against the joint venture and that arise out of any joint venture matter or transaction occurring before September 24, 1998. However, paragraph 6 of the release specifically extended the duty to indemnify for "possible" claims that might be brought by the Village of Carol Stream and Parkway Bank in connection with financing obtained by Krilich or others acting on behalf of the joint venture. The final sentence of paragraph 6 merely defines the amount of each joint venturer's contribution for potential sums owed to the village and Parkway Bank. The sentence does not revive the joint venturers' duty to indemnify for all claims presented after the release was executed. Such an interpretation of paragraph 6 would be inconsistent with the broad, plain language of paragraph 2.

The dissent concludes that the joint venturers did not anticipate Bongi's claims before executing the release, and therefore, the mutual release does not extinguish the joint venturers' duty to indemnify Krilich for those claims. We respectfully disagree. The intention of the parties controls the scope and effect of a release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement. A release will not be construed to include claims that the parties did not contemplate. *Doctor's Associates*, 319 Ill. App. 3d at 1045.

While terminating the joint venture, the joint venturers executed the mutual release to extinguish their duties to the joint venture and to each other. The scope of the mutual release is defined by the events, occurrences, and transactions that might lead to a claim against the partnership. The timing of the presentation of a particular claim is irrelevant, and the scope of the paragraph 6 extension of the right to indemnification is defined by the identity of the party presenting the claim. In respectful disagreement with the dissent, we conclude that Krilich and the other joint venturers considered the possibility that claims such as Bongi's might be brought against the joint venture after the execution of the mutual release but nevertheless chose to extend their indemnification rights for claims brought by only the Village of Carol Stream and Parkway Bank.

Krilich contends that the joint venturers did not intend to terminate their indemnification rights concerning any claims presented after the execution of the release. If we were to adopt Krilich's narrow interpretation of the mutual release, the release would extinguish the duty to indemnify for only those claims against the joint venture that had already been presented at the time the release was executed. However, Krilich does not allege that any third party who had done business with the joint venture had already filed a claim to which the mutual release could be intended to apply. If no third party had filed a claim against the joint venture at the time the mutual release was executed, there would be little reason for the joint venturers to terminate their duty to indemnify for those nonexistent claims.

Moreover, Krilich's interpretation undermines the purpose of the mutual release, namely, the dissolution of the joint venture and the termination of the joint venturers' liability to one another for all claims except those that might be brought by the village and Parkway Bank. The release's express exclusion of these two types of potential claims reveals that the joint venturers considered the possibility that parties with whom they had conducted business, including Bongi, might present certain claims after the execution of the release. The joint venturers nevertheless limited the release's exclusion to potential claims by the village and Parkway Bank. This shows the joint venturers' intent to terminate their indemnification rights concerning all other potential claimants, including Bongi. Therefore, we conclude that the trial court correctly dismissed Krilich's third-party complaint for indemnification because the mutual release terminated the joint venturers' duty to indemnify him for Bongi's counterclaims.

For these reasons, the orders of the circuit court of Du Page County are affirmed.

Affirmed.

GROMETER, J., concurs.

JUSTICE O'MALLEY, specially concurring in part and dissenting in part:

I dissent from the part of the majority's opinion that affirms the trial court's judgment granting the joint venturers' motion to dismiss Krilich's third-party complaint seeking indemnification. I believe that the motion to dismiss raised issues of fact that are inappropriate for summary resolution under section 2—619 of the Illinois Code of Civil Procedure (735 ILCS 5/2—619 (West 2000)). Also, I believe that the majority has misapplied the standards governing interpretation of release agreements.

The majority believes it is "plain" that the release "generally extinguished the joint venturers' obligation to indemnify one another for claims that 'may' exist against the joint venture and which arise out of any joint venture matter or transaction occurring before September 24, 1998." 334 Ill. App. 3d at 575. The obvious implication of this interpretation is that the release does not apply to transactions of the joint venture occurring *after* September 24, 1998. The record shows, however, that September 24, 1998, was the date the joint venture was dissolved by order of the trial court. Therefore, there could not have been any business of the joint venture occurring after September 24, 1998. To include in the release any reference, implicit or explicit, to business of the joint venture occurring after September 24, 1998, would have been needless because there could be no such business. To include in the release a provision impliedly excluding claims related to such business would have been absurd because there can be no liability in the first instance for impossible events. But this oddity is precisely what the majority ascribes to the parties. The majority fails to consider a circumstance surrounding the execution of the release that completely undercuts its view that the central distinction in the release is between business of the joint venture occurring before and after the execution of the release.

In my view, September 24, 1998, is a cutoff date that relates not to the business of the joint venture (because there could be no business of the joint venture after September 24, 1998) but to the bringing of claims. The release, in my view, bars only claims (based on partnership business) brought after September 24, 1998, that were known to the parties when the release was signed.

The case law on the interpretation of releases is well established:

"'[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release [citation] or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties.'" *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 839 (1995), quoting *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill. App. 3d 435, 439 (1982).

Exculpatory agreements releasing parties from future liability are not favored. *Stratman v. Brent*, 291 Ill. App. 3d 123, 137 (1997). Such agreements are strictly construed against the benefitting party and "'must spell out the intention of the parties with great particularity.'" *Stratman*, 291 Ill. App. 3d at 137, quoting *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 112 Ill. 2d 378, 395 (1986).

Our supreme court has provided specific guidelines for the interpretation of general releases like the one at issue here:

"Where the releasing party was unaware of other claims, Illinois case law has restricted general releases to the specific claims contained in the release agreement. [Citation.] However, where both parties were aware of an additional claim at the time of signing the release, courts have given effect to the general release language of the agreement to release that claim as well. [Citations.]" *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991).

A court reviewing a release "will not interpret generalities so as to defeat a valid claim not then in the minds of the parties." *Martin v. Illinois Farmers Insurance*, 318 Ill. App. 3d 751, 764 (2000). "Where there are only words of general release, the courts will restrict the release to the thing or things intended to be released ***." *Carlile*, 271 Ill. App. 3d at 839.

I have not concluded, as the majority asserts, that the joint venturers "did not anticipate Bongi's claims before executing the release." 334 Ill. App. 3d at 575. Rather, I believe, as I explain below, that what the parties intended in drafting the release was an issue of fact inappropriate for summary resolution under section 2—619.

First, however, I disagree with the majority over the applicable legal standards. The majority concludes that the release applies to Krilich's claim because "Krilich and the other joint venturers considered the possibility that claims such as Bongi's might be brought against the joint venture" after the release was executed. 334 Ill. App. 3d at 576. However, the fact that the parties "considered the possibility that claims such as" the claim allegedly released would be brought will not by itself pull that claim within the sway of the release. A claim not in existence when a release is signed is not extinguished

absent a clear expression of intent to that effect. *Chubb v. Amax Coal Co.*, 125 Ill. App. 3d 682, 686 (1984). "[A] general release does not apply to an unspecified claim if the releasing party is unaware of such claim when executing the release." *Myers v. Health Specialists, S.C.*, 225 Ill. App. 3d 68, 75 (1992); accord *Whitlock*, 144 Ill. 2d at 448 ("[a] general release is inapplicable to unknown claims"). Where a general release is claimed to have extinguished a claim not specified in the release, Illinois courts determine not whether the parties considered the possibility that a third party might bring claims akin to the claim brought but whether that particular claim was in the minds of the parties when the release was executed. See *Carlile*, 271 Ill. App. 3d at 839-40 (release agreement signed when plaintiff terminated his dealership agreement with defendant did not apply to fraud claim based on defendant's alleged misrepresentations about the viability of a dealership during negotiations because plaintiff did not contemplate fraud claim when he signed the release but considered the unprofitability of the dealership to be entirely his own fault); *Myers*, 225 Ill. App. 3d at 75 (release agreement, which purported to release defendant, plaintiff's employer, from "all claims" that plaintiff "now has" or "ever had" prior to the date of the release based on "any employment contract" with defendant, constituted a mere "general release" that was inapplicable to plaintiff's claim for insurance coverage based on incident occurring during plaintiff's employment; the claim was "unknown but discoverable" at the time the release was signed). We have all seen releases that are carefully worded as to bring within their sway *all* present and future claims whether known or unknown. Even such sweeping language (which, I emphasize, is not present in the release at issue) is not dispositive, for " 'no form of words, no matter how all encompassing, will foreclose scrutiny of a release' " (*Carlile*, 271 Ill. App. 3d at 839, quoting *Ainsworth*, 107 Ill. App. 3d at 439).

The close scrutiny of a release is especially appropriate where a party seeks the benefit of a release that purportedly extinguishes liability between numerous members of a joint venture, as is the case here. Joint ventures are governed by partnership principles. *In re Johnson*, 133 Ill. 2d 516, 526 (1989). As in a partnership, every member of a joint venture can be held liable to a third party for acts of the other joint venturers done in the course of the enterprise. *Fentress v. Triple Mining, Inc.*, 261 Ill. App. 3d 930, 940 (1994). A release of "all claims," as the agreement at issue purports to effect, would entail a release of claims for contribution and indemnification. So, for example, did William Lange (who received $49,910.26 when the assets of the joint venture were distributed upon dissolution) intend to

foreclose his right to seek indemnification from Krilich (who received $736,756.48 upon dissolution) in the event some third party such as Bongi chose at some time in the future to hold Lange solely liable for some unknown claim arising from the activities of the joint venture occurring prior to September 24, 1998? The majority points to no surrounding circumstances that would make such an intention rational. Krilich's receipt of substantially greater assets upon the joint venture's dissolution than any other joint venturer is a circumstance that suggests a rational reason why Krilich might agree to release the other joint venturers, but there is no circumstance surrounding the agreement that suggests a rational reason why the other joint venturers would release Krilich from liability.

The joint venturers' motion to dismiss was brought under section 2—619 and, in my view, raised issues that precluded dismissal under that section. A motion to dismiss pursuant to section 2—619 should be granted if, after construing the pleadings and the supporting documents in the light most favorable to the nonmoving party, the trial court finds that no set of facts can be proved upon which relief could be granted. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000). A section 2—619 motion to dismiss affords a defendant a means of obtaining a summary disposition when the plaintiff's claim can be defeated as a matter of law or on the basis of easily proved issues of fact. *McGee v. State Farm Fire & Casualty Co.*, 315 Ill. App. 3d 673, 680 (2000). The questions on review of a dismissal under section 2—619 are whether a genuine issue of material fact exists and whether the defendant is entitled to a judgment as a matter of law. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001). Illinois courts repeatedly have characterized section 2—619 motions as similar to summary judgment motions. See *Feldheim v. Sims*, 326 Ill. App. 3d 302, 310 (2001) (citing numerous cases reflecting similarity of treatment). Accordingly, because "summary judgment is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions" (*Raprager v. Allstate Insurance Co.*, 183 Ill. App. 3d 847, 859 (1989)), I believe that the trial court's dismissal of Krilich's complaint was inappropriate because the interpretation of the release agreement involved questions of intent—specifically, whether the parties knew of Bongi's claim when they executed the general release but intended nonetheless to release that claim as well.