2021 IL App (2d) 200387-U
No. 2-20-0387
Order filed May 5, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE JAMES A. BLAZINA REVOCABLE TRUST, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 19-CH-0202 |
| THE TRACEY A. BENCK TRUST and DUTCH CREEK HOMEOWNER'S ASSOCIATION, | ) ) ) ) | Honorable Kevin G. Costello, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We affirm the circuit court's section 2-619 dismissal of plaintiff's third amended complaint, which sought to enjoin one of the defendants from building a swimming pool and cabana on the side of her property.  Affirmed.

¶ 2   Defendants, the Tracey A. Benck Trust (Benck) and the Dutch Creek Homeowner's Association (Association), moved pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2020)) to dismiss plaintiff's, the James A. Blazina Revocable Trust's (Blazina's), third amended complaint, which sought to enjoin Benck, the person, from building a

swimming pool and cabana on the side of her property.[1]  The circuit court granted the dismissal, finding no violation of the Association's covenants.  Blazina appeals, arguing that the circuit court misinterpreted the covenants.  We agree with the circuit court's interpretation of the covenants, and we affirm.

¶ 3                               I. BACKGROUND

¶ 4      The Association adheres to a set of covenants, the most recent of which is the 2013 Covenant.  The 2013 Covenant provides that an owner wishing to build an inground swimming pool must do so in the *back* of the property.  However, the 2013 Covenant also set forth a process by which an owner can obtain a variance, provided the Association finds that "causes" warranted the deviation.  That provision is set forth in Clause IV, paragraph 17, which provides:

> "DEVIATIONS BY AGREEMENT WITH THE ASSOCIATION.  The Association hereby reserves the right to enter into agreements with the Owner of Any Lot or Lots without the consent of Owners of other Lots of adjoining or adjacent property to deviate from any or all of the Covenants set forth in this Clause IV, provided the Association shall in its sole discretion determine that there are causes, difficulties, or hardships evidenced by the Owner to warrant such deviation (which shall be evidenced by an agreement in writing).  Said grant of deviation shall in no event constitute a waiver of any such Covenant as to the remaining Property in this Subdivision nor shall [the] same constitute a violation of a Covenant ***."

¶ 5      Benck and the Association by its Board entered into an agreement pursuant to paragraph 17, which allowed Benck to build a pool and cabana on the *side* of her property.  Benck had a

_____

[1] For ease of reading, we refer to the parties as Benck and Blazina, the people, throughout the order.

large, 10-acre property, but much of it was wetlands unsuitable for building a pool and cabana. The Association determined that the wetlands constituted a "cause" to build the pool on the side of the property. Later plans clarified that the cabana would connect to the main home with a breezeway to minimize the visual impression of an additional, stand-alone structure on the property. Also, the plans show that the outer edge of the pool would be 150 feet from the property line of the nearest neighbor. That neighbor was Blazina.

¶ 6    Blazina sought to enjoin Benck from building the pool. Initially, Blazina filed suit against Benck seeking a declaratory judgment that Benck's plans violated the 2013 Covenant. Blazina later amended his complaint to add the Association as defendants. Although Benck had already expended money on plans by an architect and received approval from both the Village of Johnsburg and the Association's Board, she agreed to halt construction pending resolution of the lawsuit.

¶ 7                              A. The Third Amended Complaint

¶ 8    The operative complaint for purposes of this appeal is the third amended complaint.[2] In it, Blazina alleged for the first time that the 2013 Covenant itself was void. Of course, if the 2013

_____

[2] We briefly note that, in his second amended complaint, Blazina alleged that the Association violated the statute governing Common Interest Community Associations by failing to provide him with certain documents within 30 days. See 765 ILCS 160/1-1 *et seq.* (West 2018). The Association argued in response that the statutory requirements at issue did not apply to associations with budgets of less than $100,000 per year, such as the Association. 765 ILCS 160/1-75 (a) (West 2018). Blazina was given an opportunity to replead, but he did not include the issue in the third amended complaint. Nevertheless, Blazina continues to refer to the Association as a

Covenant were void, then the paragraph 17 deviation procedure contained therein would be void. Also, absent paragraph 17's deviation procedure, Benck's plan violated the covenant's restriction against side pools. In addition to seeking a declaratory judgment that Benck's plans violated the covenant and enjoining Benck from proceeding with the construction of her pool, Blazina further alleged that the Board breached its fiduciary duty to all the owners by approving the plan.

¶ 9    Blazina argued that the 2013 Covenant was void, because it was not invoked in accordance with the amendment procedure set forth in the original, 1991 Covenant. Blazina quoted the 1991 Covenant, Clause VII as follows:

> "[T]he recorded owners in fee simple of the Lots in This Subdivision may revoke, modify, amend, or supplement in whole or in part any or all of the Covenants and conditions contained in this Declaration and may release from any part of all of said Covenants all or any part of the real property subject thereto, but only at the following times and in the following manner:
>
> A. Any such change or changes may be made effective at any time within five (5) years from the date or recording of this Declaration if consent thereto is procured from the record owners in fee simple of the real estate which constitutes eighty (80%) percent of the surface area within (i) This Subdivision and (ii) all other portions, in any, of Dutch Creek Estates owned by Declarant.
>
> B. Any such change or changes may be made effective after the end of said initial five (5) year period if the record owners in fee simple of at least two-thirds

_____

common interest community association. We choose to disregard these references.

(2/3) of the Lots in This Subdivision and all other portions of Dutch Creek Estates subjected to the Covenants consent thereto.

C. Any such written consents shall be effective only if expressed in a written instrument or instruments executed and acknowledged by each of the consenting owners (and Declarant, if required) and recorded in the office of the Recorder of Deeds of McHenry County, Illinois."

¶ 10    Blazina noted that, as the initial five-year period had passed, paragraphs B and C required the signed consent of two-thirds of the owners, with said signatures to be recorded. Neither party disputes that the *actual* signatures of two-thirds of the owners were never recorded. Instead, an affidavit averring that the signatures had been obtained was recorded.

¶ 11                    B. Defendant's Section 2-619 Motion to Dismiss

¶ 12    Defendants moved to dismiss, arguing that Blazina misinterpreted the 1991 Covenant, Clause VII. Blazina *neglected to quote the sentence immediately following paragraph C*, which stated that "[a] recorded certificate shall be deemed conclusive evidence thereof with regard to compliance with the provisions of this section." Defendants noted that here, in conjunction with the 2013 Covenant, the Association, by its Board, had recorded the following certificate, which it termed the "Affidavit of Secretary":

"I, Lynda Ames, state that I am the Secretary of the Board of Directors of the Dutch Creek Homeowner's Association, and hereby certify that the consent for the foregoing Third Amendment of the Amended and Restated Declaration of Covenants, Conditions and Restrictions for Dutch Creek Estates has been given by the record owners in fee simple of at least two-thirds (2/3) of the lots in the Property by a written instrument or instruments executed and acknowledged by each of the consenting owners and this Affidavit shall serve

as the certificate of compliance with the provisions of the Declaration and shall be recorded in the office of the Recorder of Deeds of McHenry County, Illinois."

The Association also had followed this procedure for its earlier amendments, such as the 2008, 2010, and 2011 Covenants.[3] Each of the amended covenants, including the 2013 Covenant, retained the Clause VII amendment procedure.

¶ 13  Defendants, relying on *Standlee v. Bostedt*, 2019 IL App (2d) 180325, argued that, because the Board followed the deviation procedure set forth in paragraph 17, Benck's plan did not violate the 2013 Covenant's restriction against side pools.  Defendants attached affidavits from its Board members establishing that they followed the procedures set forth in paragraph 17.  Also, because the Board acted in accordance with paragraph 17, it did not breach its fiduciary duty to the other owners in the Association.

¶ 14  Blazina responded to the motion to dismiss.  Blazina did not file a counter-affidavit or otherwise challenge defendants' affidavits establishing that they followed the procedures set forth in paragraph 17.

¶ 15  Instead, Blazina argued that paragraph 17 did not, in fact, authorize *the Board* to grant a deviation.  Blazina wrote:

"Paragraph 17 *** states, 'The Association hereby reserves the right to enter into agreements with the Owner of any Lot or Lots without the consent of owners of other Lots of adjoining or adjacent property to deviate from any or all of the Covenants ***.'  *** Paragraph 17 makes no reference to the Board, only the Association.

---

[3] There had also been a 2001 Covenant, which had been invoked by the developer and with which Blazina does not take issue.

In order to clarify this provision, it is important to look to Clause VII[,] paragraph [C] of the [1991] original covenants [which is essentially mirror in Clause VII, paragraph C of the 2013 Covenants] to determine how deviations from the covenants are to be dealt with."

Thus, Blazina contended that Clause VII, not Clause IV, paragraph 17, controls the deviation procedure. Again, Clause VII provides that amendments to the Covenants—which, in Blazina's view were synonymous with deviations from the Covenants—require the consent of two-thirds of the owners.

¶ 16                      C. The Circuit Court's Written Order

¶ 17    The circuit court granted defendants' section 2-619 motion to dismiss in a written order. It determined that the 2013 Covenant was valid and enforceable. It disagreed that the 1991 Covenant, Clause VII required the owners' actual signatures to be recorded; such an interpretation "would render the provision 'A recorded certificate shall be deemed conclusive evidence thereof with regard to compliance with the provisions of this section' to be meaningless—even nonsensical."

¶ 18    The circuit court further rejected Blazina's argument that paragraph 17 did not authorize *the Board* to enter into a deviation agreement. It wrote that "the only logical and reasonable interpretation" was that paragraph 17's reference to "the Association" meant "The [Dutch Creek Homeowner's Association] *Board*." (Emphasis added.) Both Illinois law and the Covenant itself dictate that homeowner's associations operate through their boards.

¶ 19    The court interpreted paragraph 17 as follows:

"The first sentence of paragraph 17 states, 'The Association hereby reserves the right to enter into agreements with the Owner…' If 'The Association' means all of the

landowners in the subdivision *** as Blazina claims, why would 'The Association' need to reserve a power onto itself? Likewise, if 'The Association' means all of the landowners in the subdivision how can that entity in 'its sole discretion' determine that *** hardships *** warrant a deviation? In the context of [p]aragraph 17, the terms 'reserves' and 'sole discretion' can only refer to an entity acting on behalf of the Association—not the entire Association. Any other interpretation is nonsensical."

The court also pointed to additional provisions in the 2013 Covenant that referred to "the Association" but clearly meant "the Association by its Board."

¶ 20    The circuit court further found that, to the extent that Blazina argued that the *deviation* agreement process set out in paragraph 17 of the 2013 Covenant in fact described an *amendment* to the Covenant itself, "[t]hat [too] is nonsensical." Such an interpretation would render paragraph 17 superfluous in its entirety. It explained:

"The deviation agreement process does not constitute an amendment to the existing Covenants but rather is a process by which individual landowners can within the framework of the existing Covenants apply for and under certain circumstances obtain relief from those Covenants without affecting their enforceability. That is exactly what happened here."

¶ 21    Finally, the circuit court noted that, because the Board acted in accordance with the established deviation agreement process, it did not breach its fiduciary duties to the other owners. This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    Blazina challenges the circuit court's section 2-619 dismissal of his third amended complaint. He focuses on the court's interpretation of Clause VII of the 1991 Covenant and Clause

IV, paragraph 17 of the 2013 Covenant. He does not revive his breach-of-fiduciary-duty argument, though he does mention it in his conclusion. Rather, he appears to concede that, if the circuit court correctly interpreted the covenants, then the covenants were not violated, Benck and the Board followed proper procedure, and the Board did not breach its fiduciary duty.

¶ 24 "A section 2-619 motion to dismiss admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that appear on the face of the complaint or are established by external submissions that act to defeat the claim." *Krilich v. American National Bank & Trust Co. of Chicago*, 334 Ill. App. 3d 563, 569-70 (2002). In a section 2-619 proceeding, the circuit court may dismiss the case following its consideration of issues of law or easily proved issues of fact. *Id*. at 570. Specifically, under section 2-619(a)(9), the court considers whether "the claim asserted *** is barred by [an] affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). An "affirmative matter" is a defense that negates an alleged cause of action completely or refutes crucial conclusions of law or material fact. *Krilich*, 334 Ill. App. 3d at 570. Here, the "affirmative matter" at issue is the interpretation of the 1991 and 2013 Covenants, which the circuit court found to negate Blazina's claim that Benck's plans violated the restriction against pools on the side of the property. Section 2-619 dismissals, as well as contract-interpretation issues, are reviewed *de novo*. *Id*. at 569 (section 2-619 dismissals); *Standlee*, 2019 IL App (2d) 180325, ¶ 57 (contract interpretation).

¶ 25 When construing a covenant that binds a homeowners' association, the rules of contract interpretation apply. *Standlee*, 2019 IL App (2d) 180325, ¶ 55. The paramount rule of contract interpretation is to give effect to the intent of the parties at the time they entered into the agreement. *Id*. The express language of the contract is the best indicator of the parties' intent. *Board of Directors of Olde Salem Homeowners' Association v. Secretary of Veterans Affairs*, 226 Ill. App.

3d 281, 286 (1992). When the language of the contract is clear and unambiguous, then the courts should look only to the four corners of the contract to ascertain the parties' intent. *Id.*

¶ 26    The contract is to be construed as a whole, giving meaning and effect to every provision where possible. *Smith v. Burkitt*, 342 Ill. App. 3d 365, 370 (2003). We presume that each provision was included for a reason. *Id.* "[A] court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted, or take away something which the parties have included." *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 81. If certain provisions of a contract appear to conflict with one another, the court should seek to harmonize the provisions to avoid a construction that would render some of the provisions meaningless. *Standlee*, 2019 IL App (2d) 180325, ¶ 55. Similarly, the court should not interpret a contract so as to produce an absurd result. *Foxfield Realty Inc. v. Kabala*, 287 Ill. App. 3d 519, 524 (1997). To the extent that a contract is susceptible of two interpretations, the interpretation that makes a more rational and probable agreement must be preferred. *Id.*

¶ 27    A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Sanders v. Illinois Union Insurance Co.*, 2019 IL 124565, ¶ 23. Whether a contract is ambiguous presents a question of law subject to *de novo* review. *Standlee*, 2019 IL App (2d) 180325, ¶ 57. If the language of a contract is ambiguous, the court may look to parole evidence to ascertain the parties' intent. *Standlee*, 2019 IL App (2d) 180325, ¶ 57. In this respect, the parties' past performance on the contract is indicative of their intent. *Id.* ¶ 56. Moreover, homeowners' associations, in particular, are given some deference in interpreting the restrictions under which they are expected to operate. See *Yorkshire Village Community Association v. Sweasy*, 170 Ill. App. 3d 155, 159 (1988) (While still performing an independent review, the court took into

consideration the association's determination that an extensive flower box arrangement was a "structure" subject to regulation by the association).

¶ 28    As the Association has noted, *Standlee*, 2019 IL App (2d) 180325, informs both issues in this case.  In *Standlee*, the first of two questions before this court was whether the covenant intended a blanket prohibition against detached garages or whether it intended a variance procedure by which an owner could seek approval of an otherwise prohibited garage.  *Id*. ¶ 59. Three paragraphs were at issue.  Paragraphs 1 and 8 prohibited all "structures" "of any kind" aside from single-family residences.  However, paragraph 3 provided that no "other structure" shall be constructed without the written approval of the association's committee.  *Id*.  The trial court determined that paragraph 3 was problematic, because it conflicted paragraphs 1 and 8 and because the committee to which it referred had dissolved.  As such, the trial court struck paragraph 3.  *Id*. ¶ 44.  Without paragraph 3, the covenant set forth a blanket prohibition against detached garages. *Id*. ¶ 45.

¶ 29    This court acknowledged that, at first blush, paragraphs 1 and 8 appeared to conflict with paragraph 3.  *Id*. ¶ 60.  However, the trial court had violated the rules of contract interpretation by striking an inconvenient provision.  *Id*. ¶ 63.  We admonished that the court cannot modify the existing terms of the contract by taking away something that the parties had included.  *Id*.  Rather, when possible, the court should seek to harmonize the seemingly discordant provisions.  *Id*. ¶ 60. We explained that it *was* possible to harmonize paragraphs 1 and 8 with paragraph 3, if one interpreted paragraph 3 to establish a variance procedure by which generally prohibited structures may nevertheless be allowed.  *Id*.  As such, we determined that the covenant did not set forth a blanket prohibition against detached garages and, instead, intended a variance procedure by which an owner could seek approval of an otherwise prohibited garage.  *Id*.

¶ 30    The second question in *Standlee* was whether the covenant's restriction against detached garages should be enforced when, due to the dissolution of the committee and the absence of any governing body within the association, the owner could not avail himself to the covenant's variance procedure. This court answered in the negative. *Id*. ¶ 67. We stated that the variance procedure set forth in the covenant was part of the covenant and was as important as the restriction itself. *Id*. ¶ 72. We explained that a reasonable person may choose to move into a community with a restriction against detached garages, but not into a community without an orderly process for implementing or waiving the restriction. *Id*. ¶ 69. As such, we permitted the owner to continue constructing his garage. *Id*. ¶ 72. With these principles and this case law in mind, we turn to the covenants at issue.

¶ 31                               A. 1991 Covenant

¶ 32    We first address the 1991 Covenant. If, as Blazina urges, the amendment procedure contained in the 1991 Covenant requires the homeowners' actual signatures to be recorded, then the 2013 Covenant is void (as were the intermediate 2008, 2010, and 2011 Covenants). If, as defendants urge and as the circuit court found, the recorded "Affidavit of Secretary" averring that the requisite number of signatures were obtained satisfies the consent requirement, then the 2013 Covenant is valid.

¶ 33    Again, the amendment procedure set forth in Clause VII of the 1991 Covenant provides:

> "[T]he recorded owners in fee simple of the Lots in This Subdivision may revoke, modify, amend, or supplement in whole or in part any or all of the Covenants and conditions contained in this Declaration and may release from any part of all of said Covenants all or any part of the real property subject thereto, but only at the following times and in the following manner:

A. Any such change or changes may be made effective at any time within five (5) years from the date or recording of this Declaration if consent thereto is procured from the record owners in fee simple of the real estate which constitutes eighty (80%) percent of the surface area within (i) This Subdivision and (ii) all other portions, in any, of Dutch Creek Estates owned by Declarant.

B. Any such change or changes may be made effective after the end of said initial five (5) year period if the record owners in fee simple of at least two-thirds (2/3) of the Lots in This Subdivision and all other portions of Dutch Creek Estates subjected to the Covenants consent thereto.

C. Any such written consents shall be effective only if expressed in a written instrument or instruments executed and acknowledged by each of the consenting owners (and Declarant, if required) and recorded in the office of the Recorder of Deeds of McHenry County, Illinois.

*A recorded certificate shall be deemed conclusive evidence thereof with regard to compliance with the provisions of this section.* Upon and after the effective date of any such change or changes, it or they shall be binding upon all persons, firms, and corporations then owning property in this Subdivision and shall run with the land and bind all persons claiming by, through, or under any one or more of them." (Emphasis added.)

¶ 34 The parties agree that, per paragraphs A and B and because the initial five-year period has passed, two-thirds of the lot owners needed to consent to any amendment. As stated, the parties disagree whether, in all circumstances, the actual signed consents need to be recorded or whether a recorded certificate can satisfy the consent requirement.

¶ 35    According to Blazina, the final paragraph impacts paragraph A and B only and provides that a recorded certificate shall be deemed "conclusive evidence" that the correct time periods and percentages are in compliance.  In Blazina's view, it does not make sense to allow a recorded certificate to provide "conclusive evidence" that the documents described in paragraph C were recorded "when all parties admit and agree that [they were] not."  Thus, Blazina urges, the final paragraph has no impact on paragraph C's requirements, and the Association must continue to follow paragraph C as though the final paragraph did not exist.

¶ 36    We agree with Blazina that, read this way, paragraph C and the final paragraph appear to conflict.  However, there is a significant problem with Blazina's reading.  That is, like the trial court in *Standlee*, Blazina has simply disregarded an inconvenient provision.  The final paragraph plainly states that a recorded certificate shall be deemed conclusive evidence of compliance with the provisions of *this section*, not with *portions of this section*.

¶ 37    If there is a way to harmonize paragraph C and the final paragraph such that the final paragraph impacts the whole of paragraph C, we must do so.  Defendants have presented such an interpretation.

¶ 38    According to defendants, and as the circuit court found, the final paragraph provides an alternate means by which proof of the signature requirement can be satisfied.  One option is that, per paragraph C, the actual signatures can be recorded.  Alternatively, per the final paragraph, a recorded certificate, such as the "Affidavit of Secretary" in this case, can provide "conclusive evidence" that the requisite signatures were obtained.  The final paragraph obviates the need to record the actual signatures and, instead, allows the Association, through its representative, to record an affidavit that the signatures were in fact obtained.

¶ 39    Several canons of contract interpretation support defendants' interpretation. First, to the extent that a contract is susceptible of two interpretations, the interpretation that makes a more rational and probable agreement should be preferred. See *Foxfield*, 287 Ill. App. 3d at 524. Here, recording a single document, the "Affidavit of Secretary," to certify that the requisite signatures have been obtained is far more efficient than recording each actual signed consent. Second, the parties' past performance on the contract is indicative of intent. See *Standlee*, 2019 IL App (2d) 180325, ¶ 56. Here, the Association amended its Covenants in 2008, 2010, 2011, and 2013, and, each time, it utilized the procedure set forth in the final paragraph. Third, and related to the previous points, we afford some deference to the Association in interpreting the restrictions under which it is expected to operate. See *Yorkshire*, 170 Ill. App. 3d at 159. Here, the Association has been operating efficiently and without complaint under its interpretation of the amendment procedure since at least 2008. As such, we conclude that the 2013 Covenant, completed as a result of the amendment procedure originally set forth in the 1991 Covenant, is valid.

¶ 40                                        B. 2013 Covenant

¶ 41    We next address the 2013 Covenant, Clause IV, paragraph 17. Again, paragraph 17 of the 2013 Covenant provides:

> "DEVIATIONS BY AGREEMENT WITH THE ASSOCIATION. The Association hereby reserves the right to enter into agreements with the Owner of Any Lot or Lots without the consent of Owners of other Lots of adjoining or adjacent property to deviate from any or all of the Covenants set forth in this Clause IV, provided the Association shall in its sole discretion determine that there are causes, difficulties, or hardships evidenced by the Owner to warrant such deviation (which shall be evidenced by an agreement in writing). Said grant of deviation shall in no event constitute a waiver of

any such Covenant as to the remaining Property in this Subdivision nor shall [the] same constitute a violation of a Covenant ***."

¶ 42 The parties dispute the meaning of paragraph 17. According to defendants, and as the circuit court determined, paragraph 17 authorizes the Association, by its Board, to enter into an agreement with an individual property owner to grant a deviation. As in *Standlee*, where the covenant contained a deviation procedure, it cannot have intended an absolute ban on the otherwise prohibited structure—there, a detached garage; here, a side pool. See *Id.* ¶¶ 61-62. Applying *Standlee* to the instant case, defendants argue that Benck's plans did not violate the 2013 Covenant, because Benck had obtained permission for a deviation.

¶ 43 According to Blazina, because paragraph 17 refers to "the Association," rather than "the Association by its Board," paragraph 17 does not authorize the Board to enter into an agreement with an individual property owner to grant a deviation. Rather, Blazina urges, Clause VII, which concerns amendments to the covenant, controls. In Blazina's view, "any modification to the covenants, even to individual landowners, must be approved by [two-thirds] of the property owners within the Association." Blazina contends that the Board should have presented the matter to "the Association," *i.e.*, all property owners within the subdivision, for a vote.

¶ 44 We agree with defendants. The 2013 Covenant makes clear that the Association operates through its Board. For example, Clause VI, which addresses the manner in which the Association is to operate, delegates numerous tasks to the Board, such as managing common areas, hiring contractors, appointing members of the architectural review committee, creating financial reserves, borrowing money, and purchasing insurance. Clause IV, paragraph 20 clarifies that the Board, not the individual members of the Association collectively, is charged with establishing additional rules and regulations that concern the subdivision.

¶ 45    Moreover, as noted by the circuit court, additional provisions in the 2013 Covenant refer to "the Association" but clearly mean "the Association by its Board."  For example, Clause IV, paragraph 21 provides that the Association is responsible for the repair of curbs on the "teardrop-shaped islands" within the community cul-de-sacs.  However, Clause VI clarifies that the Board is to manage common areas.  The curbs are common areas.  Therefore, Clause IV, paragraph 21's reference to the Association is a reference to the Association by its Board.  Indeed, to expect *all* of the individual property owners to organize and participate in a curb-repair project, when a Board has already been established to do the same, would be a highly improbable interpretation of the term "the Association."  Looking to the 2013 Covenant as a whole, it is clear that Section 17's reference to "the Association" is shorthand for "the Association by its Board."

¶ 46    This interpretation is consistent with the manner in which homeowners' associations operate.  As stated in Clause VI, paragraph 1, the Association is an Illinois not-for-profit corporation.  Not-for-profit corporations are required to have a Board of Directors that is entitled to take action on behalf of the corporation.  805 ILCS 105/108.05 (West 2018).  " 'In recent years it has become increasingly common for the declaration of covenants to establish a homeowners association with the power to enforce the restrictive covenants' after a developer has ceased involvement in maintaining the common scheme."  *Standlee*, 2019 IL App (2d) 180325, ¶ 54 (quoting 4 Illinois Forms Legal & Business § 11:57 (Aug. 2018) (Declaration of Covenants)). The association's governing body may act on behalf of all homeowners within the association.  *Id.*

¶ 47    Blazina's interpretation, in contrast, is unreasonable.  Blazina essentially argues individual property owners seeking a *deviation* should refer to Clause VII, which governs *amendments* to the Covenant.  However, if an individual property owner seeking a deviation under Section 17 actually must follow Clause VII, then Section 17 would have no purpose.  As we have stated, we must

interpret a covenant so as to avoid rendering any one provision meaningless.  See *Standlee*, 2019 IL App (2d) 180325, ¶ 55.

¶ 48   Indeed, Blazina fails to distinguish between a deviation and an amendment.  Blazina argues: "The [circuit court] in its ruling asserted '[the Paragraph 17] deviation agreement process does not constitute an amendment to the Covenants but rather is a process by which individual landowners can within the framework of the existing Covenants apply for and under certain circumstances obtain relief from those Covenants without affecting their enforceability.' *Somehow*, the court ruled that '*deviation*' and 'relief from those Covenants' *does not mean modify or amend* the covenants with regards to individual properties."  (Emphases added.)

¶ 49   However, a deviation and an amendment *are* two different things.  A deviation means a "departure from accepted norms."  Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/deviation (last visited April 20, 2021) (definition d).  This definition presumes that the "accepted norms" or general rule remains in place.  In contrast, an amendment means "an alteration proposed or effected by [the] process" of "altering *** a law or document ***."  Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/amendment (last visited April 20, 2021) (combining definitions b and a, respectively).  In the case of an amendment, the rule itself has changed.

¶ 50   Paragraph 17 applies to deviations from the Covenant, and Clause VII applies to amendments to the Covenant.  Blazina's position that individual property owners seeking a deviation should refer to Clause VII, which governs amendments, is simply incorrect.

¶ 51   Having determined that the circuit court correctly interpreted Clause VII of the 1991 Covenant and Clause IV, paragraph 17 of the 2013 Covenant, we affirm the section 2-619 dismissal of Blazina's third amended complaint.

¶ 52                       III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 54    Affirmed.