2022 IL App (2d) 210043
No. 2-21-0043
Opinion filed February 28, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| POWER DRY OF CHICAGO, INC., d/b/a Chicago Water and Fire Restoration, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 20-CH-250 |
| MATTHEW BEAN; MAURISSA BEAN; RAYMOND D. BEAN; LUTHERAN MUTUAL FIRE INSURANCE COMPANY; L.J. SHAW & COMPANY; CALIBER HOME LOANS, INC.; and UNKNOWN NECESSARY PARTIES, | ) ) ) ) ) ) ) | |
| | ) | Honorable |
| | ) | James R. Murphy, |
| Defendants-Appellees. | ) | Judge, Presiding |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Birkett and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Power Dry of Chicago, Inc., d/b/a Chicago Water and Fire Restoration (CWFR), appeals from the trial court's dismissal of counts I through VII of its first amended complaint against defendants, Matthew Bean, Maurissa Bean, Raymond D. Bean, Lutheran Mutual Fire Insurance Company (Lutheran Mutual), L.J. Shaw & Company (LJ Shaw), Caliber Home Loans, Inc. (Caliber), and unknown necessary parties. The trial court granted the dismissal pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2018))

after finding that CWFR was acting as an unlicensed public adjuster in violation of both the Public Adjusters Law (215 ILCS 5/1501 *et seq.* (West 2018)) and the public insurance adjusters and registered firms statute (adjusters and firms statute) (215 ILCS 5/512.51 to 512.64 (West 2018)) of the Illinois Insurance Code, rendering void and invalid its contract assigning it rights to the Lutheran Mutual insurance policy held by the Beans. For the reasons that follow, we affirm the trial court's dismissal.

¶ 2                                    I. BACKGROUND

¶ 3     On or about March 2, 2020, a fire occurred at the home of defendants Matthew and Maurissa Bean. Maurissa engaged CWFR regarding mitigation and reconstruction services. Maurissa, on behalf of Matthew, executed a "Mitigation & Repair Work Authorization" (the contract) with CWFR. The authorization contains a section titled "Price of Work and Terms of Payment," which states, in pertinent part, as follows:

> "The initial price for the Work will be the Xactimate Invoice calculated using the Xactimate software by [CWFR]. The pricing published by Xactimate is considered a normal and customary guide in the restoration and insurance industry."

The contract also contains a section titled "Insurance Matters and Direct Pay Authorization," which states, in full, as follows:

> "The Xactimate invoice will be submitted by [CWFR] or Customer to the insurer of the Customer. Customer will assign all rights and benefits to its insurance payments for the loss to [CWFR] in order to expedite payments and fulfillment of this Contract."

Following the execution of the contract, CWFR performed mitigation work to the Bean home and completed that work on March 9, 2020. CWFR then secured a verbal commitment from the Beans

to perform reconstruction work on the home. CWFR prepared a reconstruction estimate for the Beans reflecting the services necessary to return the home to its condition before the fire.

¶ 4    Using Xactimate software, CWFR invoiced the Beans $12,764.39 for mitigation services and filed a claim with Lutheran Mutual, Matthew's insurer. LJ Shaw was engaged by Lutheran Mutual to adjust CWFR's claim. Lutheran Mutual and LJ Shaw informed CWFR that no consideration would be given to any information provided by CWFR in evaluation of liability. Additionally, CWFR was informed by Lutheran Mutual and LJ Shaw that it could take any action deemed necessary if displeased with LJ Shaw's adjustment of the claim.

¶ 5    LJ Shaw adjusted the claim to $4,389.64. The record presented to this court does not explain how LJ Shaw arrived at this figure. On March 23, 2020, CWFR offered to reduce its invoice to $9,139.31, using a revised Xactimate estimate. Ultimately, no agreement was reached, and the Beans decided to look for another company for reconstruction work on their home.

¶ 6    On March 24, 2020, CWFR filed a claim for mechanic's lien against the Bean property. The claim stated that "[CWFR] entered into a contract with *** Matthew Bean **** to perform water mitigation for the *** real property of a value of and for the sum of $12,764.39." Pursuant to an obligation under its insurance policy, Lutheran Mutual issued a payment of $4,389.64 to Matthew. Matthew then issued that payment to CWFR.

¶ 7    CWFR filed an eight-count complaint against the Beans, Lutheran Mutual, LJ Shaw, and Caliber Home Loans, Inc. (Caliber).[1] Count I was directed at the Beans and Caliber, seeking

---

[1] CWFR filed its original complaint on April 12, 2020. Following a disclaimer in interest by Cherry Creek Mortgage, Mortgage Electronic Registrations Systems, Inc. (MERS) was joined in the first amended complaint on August 17, 2020. On September 30, 2020, MERS's motion to

foreclosure on the mechanic's lien, pursuant to the Mechanics Lien Act (770 ILCS 60/0.01 *et seq.* (West 2018)), in the amount of $4,795.56. That amount represented the revised invoice of $9,139.20 minus the $4,389.64 payment by Matthew. Count II alleged breach of contract against the Beans and sought damages for $4,749.56. Count III asserted a claim for *quantum meruit*, again seeking $4,749.56 in damages.

¶ 8    Counts IV and V were directed against Lutheran Mutual. Count IV was for breach of contract and alleged that CWFR's contract with Matthew contained a valid assignment of benefits of his rights to Lutheran Mutual's issued insurance policy, making CWFR a third-party beneficiary to the policy and entitled to $4,749.56 in damages. Count V was for bad faith under section 155 of the Insurance Code (215 ILCS 5/155 (West 2018)) and alleged Lutheran Mutual to be

> "vexatious and unreasonable because *** (i) there is no *bona fide* coverage dispute, (ii) Lutheran Mutual and its adjuster would not even speak with CWFR until after CWFR sent a demand letter, (iii) after Lutheran Mutual received CWFR's demand letter, Lutheran Mutual and its adjuster refused to consider any information provided by CWFR, suggesting that it did not process the claim in good faith."

CWFR sought damages in count V pursuant to section 155(1)(a)-(c) of the Insurance Code (215 ILCS 5/155(1)(a)-(c) (West 2018)).

¶ 9    CWFR directed counts VI and VII against LJ Shaw for tortious interference with prospective business advantage and tortious interference with contract, respectively. CWFR alleged in each count that

---

substitute Caliber was granted. All allegations raised in CWFR's original complaint are identical to those raised in its first amended complaint.

"LJ Shaw purposefully interfered with CWFR's relationship with Mr. and Ms. Bean by ignoring CWFR's communications and leaving the Bean family in such a state of uncertainty that they decided not to have CWFR perform the reconstruction."

Both counts sought $4,426, representing CWFR's anticipated profit from reconstruction work on the Bean property.

¶ 10    Regarding count VIII of the complaint,[2] CWFR attached a screenshot of a March 23, 2020, review Maurissa posted to the Better Business Bureau's website, in which she describes her experience and frustration with CWFR as follows:

"In March of 2020, we had a fire in our home. The rep from CWFR came to our home and scanned all the areas where there was fire damage and said that we would need everything removed and sanitized. We did not receive a quote until the work was done (Deceiving) and he assured us that our insurance would cover all costs and CWFR would deal directly with the insurance company. *** We had contacted the insurance company telling them about CWFR cleaning our home and the adjuster came out as well as CWFR to argue over the estimate *** that was later given after the work was done. I told him that he could deal directly with CWFR, and CWFR has yet to contact the adjuster about the work and coming to an agreement about the work that has been done. I have been in constant contact with CWFR. They misrepresented that insurance would cover any and all work, and he never provided a quote beforehand[.] [H]ad we known that cost and that we

_____

[2] Count VIII for defamation against Maurissa was not raised in the defendants' section 2-619 motions to dismiss and remains pending as of this appeal.

may be responsible for thousands of dollars *** we would never have agreed to the amount of work and equipment ***."

CWFR responded to Maurissa's post on the website, but the screenshot attachment cut off the response after only a couple of sentences.

The Beans and Caliber both filed motions to dismiss CWFR's complaint, pursuant to section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2018)) of the Code, while Lutheran Mutual and LJ Shaw filed a motion to dismiss pursuant to sections 2-619(a)(2) and 2-619(a)(9) (735 ILCS 5/2-619(a)(2), (9) (West 2018)).[3] All motions argued that CWFR's contract with Matthew was void and barred under the Insurance Code. All defendants alleged that CWFR, although not licensed as a public adjustor, held itself out to be in the business of claims adjusting and acted in claims adjusting activities with the Beans as defined by both the Public Adjusters Law (215 ILCS 5/1501 *et seq.* (West 2018)) and the adjusters and firms statute (215 ILCS 5/512.51 to 512.64 (West 2018))[4] of the Insurance Code, rendering the contract void and invalid. Without a valid and enforceable contract, defendants argued, counts I to VII were deficient as a matter of law and must

---

[3] The Beans' motion to dismiss was titled "Motion To Strike Counts I, II and III Of Plaintiff's Complaint," as those counts were the only three directed at the Beans collectively.

[4] Article XXXI 3/4, sections 512.51 through 512.64 of the Illinois Insurance Code was repealed by Public Act 102-135 (eff. July 23, 2021However, the provision relevant to this appeal was effective at all times during the underlying proceedings, making its strictures applicable to this case. Any change should not be applied retroactively, because the repeal was a substantive change, not a procedural one. See *Perry v. Department of Financial & Professional Regulation*, 2018 IL 122349, ¶ 43.

be dismissed.

¶ 11    The motion to dismiss filed by the Beans contained a recitation of e-mail communications between Maurissa and CWFR as evidence of CWFR's engagement in adjusting the insurance claim for the Beans. An affidavit from Maurissa authenticating the e-mails was attached to the motion. On March 3, 2020, at 1:19 p.m., Maurissa sent an e-mail inquiry to CWFR's operations assistant, Samantha Drake, which read:

> "Can you please explain the way [CWFR] gets paid from the insurance company and the financial part and the 65% payment down[?] This is so my husband has it in writing for his own information and to better understand coming from you."

Drake responded to Maurissa's e-mail at 1:27 p.m. on March 3, 2020, as follows:

> "We will be using the 3D scans that were taken of your home to write an estimate to restore your home back to pre-loss condition. Once the repair estimate is complete we will send a copy to you via email and submit the estimate directly to Lutheran Mutual. We work with your insurance company to reach an agreed price on the scopes so that when we do move forward with the rebuild, you are only financially responsible for your deductible. After an agreement has been reached with Lutheran Mutual, we can schedule you with one of our Reconstruction Project Managers, who will come out to your home to go over the estimate in detail, discuss all material selections, have you sign the necessary paperwork, and give you an exact timeline for the work as he will be scheduling the crews to come out and perform the repairs. Your project manager will need to collect a 65% deposit based off the agreed upon estimate before any work can begin, however typically at this time you will have already been provided payment by Lutheran Mutual. The remainder of the funds will be collected once the project is complete. If you would like to provide us with a copy

of the scope that Lutheran Mutual wrote based off their inspection of your home, we find that this tends to help expedite the agreement process as we are able to pinpoint any major discrepancies and negotiate on your behalf to reconcile ***."

At 1:37 p.m. on March 3, 2020, Maurissa responded to Drake with the following e-mail:

"If we do not have the 65% to put down then do we just wait for the insurance check to come? The remainder of the funds will be collected once the project is complete, [i]s this an extra charge to us? Saying your quote is [$]12,000 and the 65% is [$]7800.00 would then the balance of the check go to [CWFR]? How does all the clean up services [*sic*] work as far as paying for that or does the clean up go straight to the insurance to be paid out[?]"

At 1:55 p.m. on March 3, 2020, Drake answered Maurissa with the following:

"If the reconstruction estimate that has been agreed upon between [CWFR] and Lutheran Mutual totals $12,000, you will be issued a check that is equal to that amount, less your deductible. Meaning if your deductible is $1,000, the check would total $11,000. You are correct in that the Project Manager would need to collect a 65% deposit total to $7,800 (based off of the agreed upon $12,000). The remainder of the funds equal to $4,200 (includes your deductible) would then be collected when the repair project is completed, there is no extra charge for this.

If you have not received the check for the reconstruction portion of the work by the time a Project Manager comes out to meet with you, we would collect the 65% when you do receive the funds from Lutheran Mutual, but the work would not be scheduled until the payment is collected.

The mitigation invoice will be finalized within 5-7 business days of the final equipment pick up and submitted to Lutheran Mutual. Any discrepancies will be negotiated

by our In House Mitigation Estimator and when an agreement has been reached, payment is typically issued directly to our company as it is for services rendered. If your insurance company plans to issue payment to you, they typically discuss this prior to sending the funds."

At 3:42 p.m. on March 3, 2020, Maurissa e-mailed CWFR accounts receivable manager, Danielle Stricker, with the following question:

"Does the insurance cover the complete rebuild or do we have to pay anything out of pocket besides the deductible? I thought you may know this because your [*sic*] on the accounting side."

On March 4, 2020, at 8:29 a.m., Stricker answered Maurissa as follows:

"Okay so the mitigation side (fire clean up) we bill after *** the work is complete and negotiate with the insurance company to come to a mutual agreement. The reconstruction side (replacing anything that was removed) is sent to insurance prior to the rebuild work beginning. We do this so that we are in agreement with price and scope before the work is completed, leaving only the deductible as the out-of-pocket expense ***."

Maurissa then e-mailed Drake at 2:21 p.m. on March 4, 2020, as follows:

"I spoke with [Matthew] and we are going to move ahead with your services. Do you know what is going to be included in the estimate?"

Drake then e-mailed Maurissa at 2:48 p.m. on March 4, 2020, with the following information:

"Our reconstruction estimates are written to restore you[r] home to pre-loss condition, so anything that was effected [*sic*] by the loss and subsequently demoed during mitigation will be included in our scope to be repaired. A Reconstruction Project Manager will be scheduled to meet you at your home once the rebuild estimate is submitted and then

approved by Lutheran Mutual, he will go over all material selections at this time. As we discussed previously, the reconstruction estimate will be completed and sent to both you and Lutheran Mutual by end of day tomorrow, March 5."

On March 9, 2020, at 9:11 a.m., Maurissa forwarded to Drake an e-mail received from LJ Shaw adjuster, Paul VanDerHeyden, that read:

"We have estimated the replacement cost value at $5,882.48 and after application of depreciation of $528.57[.] Your actual cash value loss is $5,353.91 and after application of your $1000 deductible, the settlement check issued will be in the amount of $4,353.91 ***."

At 10:03 a.m. on March 9, 2020, Drake acknowledged receipt of the LJ Shaw e-mail and informed Maurissa that the information would be forwarded to "Estimator Derrick" for review. Derrick "will then be pinpointing any major discrepancies and reaching out to adjuster Paul [of LJ Shaw] to negotiate and reconcile." At 6:12 p.m. on March 9, 2020, Maurissa e-mailed Derrick and Stricker the following:

"Do you know how much our mitigation was[?] We were never given a quote prior to your services and have not been told completely that our insurance would cover all the cost. LJ Shaw (adjuster) told us he was not going with [CWFR] quote nor was he willing to work with your company and most likely not answer your phone calls or emails. We just don't want to be in a position that the amount was offered from the insurance company just to cover the mitigation and *** left with not having our house fixed and left with the disarray [w]e are living in. We were also promised by many departments [that] all we will have to pay is our deductible. We feel very left in the dark and confused. We just want to

- 10 -

make sure our home will be left in prefire condition as promised not given false information from your company."

Stricker responded on March 10, 2020, at 8:29 a.m. as follows:

"The mitigation cost is not finalized yet but I can tell you that if this is the answer your carrier is giving you, you might want to ask for a different adjuster or the current adjuster's supervisor. [LJ Shaw] doesn't seem to be handling this claim in good faith. We are estimating work that needs to be completed to get your home back to pre-loss condition and if [LJ Shaw] is that far apart from us, something is wrong. Perhaps ask how much your coverage limits are? If coverage limits are above our amounts, there is no reason that [LJ Shaw] shouldn't be able and willing to work with us to get to a mutual agreement. We will know more once the mitigation amount is finalized and Derrick looks at [LJ Shaw's] estimate. In the meantime, find out the coverage limits for this loss/policy coverage."

Maurissa wrote an e-mail to Stricker on March 10, 2020, at 8:39 a.m. that read as follows:

"We cannot ask for a different adjuster because [VanDerHeyden] is the president of the company. I have tried to talk with Lutheran Mutual, however they circle me back to LJ Shaw. As far as finding out the coverage limits, isn't that the job of [CWFR]?"

At 8:40 a.m. on March 10, 2020, Stricker responded as follows:

"The insured would need to get that information from the insurance company. When it comes to super specific policy details, carriers typically won't give a third party that information. We obviously know this a covered loss."

After Maurissa exchanged e-mails with Stricker and an operations manager at CWFR regarding her concerns about insurance coverage versus the costs charged by CWFR, she received the

following e-mail from Blake Veldman, production manager with CWFR, at 5:28 p.m. on March 11, 2020:

"When it comes to insurance claims, the policy holder is mostly responsible for 2 things: quick action, and their deductible. Meaning, once an occurrence has happened that causes significant damage to the home, the policy holder must quickly stop the source of the damage, mitigate it from spreading any further, and then cover a portion of the costs. As far as my review of your file has shown, you've lived up to your requirements thus far.

That leaves your insurance company responsible for indemnifying you of any 'fair and reasonable' costs associated with the loss, minus the above-mentioned deductible, in order to get the home back to pre-loss condition. I put quotes on that because there are occasions where a contractor and an insurance company may have different opinions on fair and reasonable. That is generally where I, or someone on my team, come in. It's not all that uncommon for 2 people to view the same loss differently. In these instances, it is standard for the adjuster to review a contractors invoice and mark a few things that he/she may consider unnecessary or 'overkill' as they say. We would then either justify our decision and supply supporting documentation, from our continuing education on industry norms, or forfeit/alter those charges to come to an agreement with the adjuster.

I have personally worked with LJ Shaw on numerous claims, and I cannot think of an instance where we couldn't come to an agreement that appeased all parties involved. I have confidence that your file will be no different. Our office will work with the adjuster on getting our representative onsite at the same time to make this happen ***."

¶ 12     CWFR filed separate responses to the Beans and to Lutheran Mutual and LJ Shaw. In its response to the Beans, CWFR argued that it was not engaged in public adjusting services but only

the mitigation and reconstruction services it contracted with Maurissa to perform. CWFR's response to Lutheran Mutual and LJ Shaw argued that the assignment of rights in the contract was permitted under Illinois law. Further, CWFR argued that it was acting as a beneficiary under the Beans' insurance policy with Lutheran Mutual and not as a public adjuster.

¶ 13    The Beans filed a reply in support of their motion to dismiss wherein they argued that CWFR's contract was void *ab initio* under the adjusters and firms statute (215 ILCS 5/512.53(c) (West 2018)) because CWFR did not possess a public adjuster's license. The reply further argued that CWFR's actions were within the purview of adjusting an insurance claim, because it was representing the Beans with Lutheran Mutual for compensation (the assignment of insurance proceeds under the Beans' policy) as contemplated by the adjusters and firms statute. The Beans attached CWFR's Xactimate estimate, which listed the "Claim Rep" as "General Executive Adjuster." The "Estimator" listed on the Xactimate estimate was "Vinnie Guaderrama." In the attached "Mitigation Cost Estimate," CWFR stated that it "engages in the mitigation and repair process of damaged structures, both in providing insurance adjustment estimates and in executing repair services requested by Property Owners."

¶ 14    Lutheran Mutual and LJ Shaw filed a supplemental memorandum in support of their motion to dismiss, further arguing that CWFR was not merely "trading for its own account" but rather acting as a public adjuster. Additional documents were attached to the memorandum, including a March 18, 2020, e-mail from Guaderrama to Maurissa. The signature line to Guaderrama's e-mail included "Illinois Public Adjuster License No. 018068229." CWFR's admission to Lutheran Mutual and LJ Shaw's request to admit "[t]hat [CWFR] did not have a license to act as a public adjuster within the State of Illinois during the period beginning January 1, 2020, and ending June 30, 2020" was also attached to the memorandum.

¶ 15    CWFR subsequently filed a surreply to Lutheran Mutual and LJ Shaw's motion to dismiss, contending that new arguments had been raised that CWFR could not have anticipated. The surreply argued that Maurissa executed a valid assignment to CWFR of the Beans' right to insurance benefits and that it was not acting as a public adjuster.

¶ 16    Lutheran Mutual and LJ Shaw supplemented the materials supporting their motion to dismiss with CWFR's full response to Maurissa's March 23, 2020, Better Business Bureau review. CWFR responded to the review on March 27, 2020, as follows:

> "Mitigation is an emergency service. As such, it is industry standard for a contractor to first complete (quickly) the necessary work and to send an invoice afterwards. (To understand the nature of our work, an analogy may be helpful. When, for example, a person goes to the emergency room, the treating doctors perform all necessary emergency medical services and then bill the patient's insurance afterward. This is not to say that we perform services as critical as emergency medical services; rather, it is to demonstrate the nature of the billing.) Our invoices are created by a highly trained employee with certifications in the industry and many years of experience. Moreover, pricing is calculated using industry standard Xactimate software. You were made aware of how we priced our service before we began our work. Our Project Managers are trained to identify whether losses are covered by insurance policies. Your loss was a 'covered loss.' That your insurance carrier failed to pay for your loss according to the policy, or to provide funds appropriately, is not something within our control. However, as I believe we have demonstrated, we advocated for you to receive the coverage you paid for. Moreover, we do, in fact, work directly (and successfully) with many insurance companies. *** As to us not being in contact with your insurance, that is completely inaccurate. Once we sent our invoice to them and you, you

told us that your adjuster had told you he 'did not want to work with us and would not be taking our calls.' As a policy holder, you have the right to choose your own vendor. If an insurance adjuster refuses to work with your chosen contractor to indemnify you, that is highly problematic. After your adjuster refused to work with us, we had our attorney send your adjuster and your insurance carrier a demand letter. (This is a great example of how we were advocating for you.) *** It is never our intention to mislead anyone and we do not believe that we have misled anyone in this case. We do not believe we mispresented 'that insurance would cover any and all work.' Rather, all we can do is determine if your loss is covered or not. In this case we correctly determined that your loss was a 'covered loss.' If your insurance company failed to indemnify you according to your policy, THEY are the ones with whom you should take issue. *** The real issue you are facing is that your insurance carrier [is] not fulfilling its obligations under your policy for which you pay your insurance premiums."

¶ 17    Following oral argument, the trial court entered an order on January 6, 2021, stating:

"[T]he Section 2-619 Motions of Lutheran Mutual, L.J. Shaw, of Matthew and Maurissa, and of Caliber be and are granted, and this Honorable Court grants the relief sought by those motions, and dismisses the claims, complaints, and causes of actions identified in Counts I through VII, inclusive, of the Plaintiff's First Amended Complaint with prejudice."

The trial court found that there was no just reason for delay of CWFR's appeal. CWFR filed this timely appeal.

¶ 18                                II. ANALYSIS

¶ 19    This appeal boils down to one essential question for this court to answer: do the pleadings

and supporting documents illustrate that CWFR was engaged in public adjusting without a license to render its contract with the Beans void *ab initio* under the strictures of the Public Adjusters Law and the adjusters and firms statute of the Insurance Code. We will address this question and the answer's effect on each claim in CWFR's amended complaint *vis-à-vis* each defendant in turn.

¶ 20     Our standard of review of a motion to dismiss under section 2-619 of the Code is *de novo*. *Krilich v. American National Bank & Trust Co. of Chicago*, 334 Ill. App. 3d 563, 569 (2002). A section 2-619 motion to dismiss admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that appear on the face of the complaint or are established by external submissions that act to defeat the claim. *Id*. at 569-70.

¶ 21     A section 2-619 proceeding permits a dismissal after the trial court considers issues of law or easily proved issues of fact. *Id*. at 570. Section 2-619(a)(9), as asserted by defendants in the present case, allows dismissal when "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). The term "affirmative matter" as used in section 2-619(a)(9) has been defined as a type of defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint. *Krilich*, 334 Ill. App. 3d at 570.

¶ 22     In ruling on a motion to dismiss under section 2-619(a)(9), the trial court may consider pleadings, depositions, and affidavits supporting a defendant's assertion of an affirmative matter, if such a matter is not apparent on the face of the complaint. *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997). The burden then shifts to the plaintiff, who must establish that the affirmative defense asserted either is " 'unfounded or requires the resolution of an essential element of material fact before it is proven.' " *Id*. (quoting *Kedzie & 103rd Currency Exchange,*

*Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993)). The plaintiff may establish this by presenting "affidavits or other proof." 735 ILCS 5/2-619(c) (West 2018). "If, after considering the pleadings and affidavits, the trial judge finds that the plaintiff has failed to carry the shifted burden of going forward, the motion may be granted and the cause of action dismissed." *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116.

¶ 23    The question on appeal is " 'whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " (Internal quotation marks omitted.) *Krilich*, 334 Ill. App. 3d at 570 (quoting *Zedella v. Gibson*, 165 Ill. 2d 181, 185-86 (1995)).

¶ 24    CWFR argues that, once Maurissa assigned to it her rights and benefits in the Beans' Lutheran Mutual insurance policy, it was acting not as a public adjuster within the meaning of the Insurance Code when it negotiated payment for mitigation work on the Beans' home but as a policyholder attempting to assert its rights after proper assignment under the policy.

¶ 25    Within its brief presented to this court, and articulated more explicitly during appellate oral argument, CWFR avers that it was attempting to obtain payment for its own account for mitigation services already rendered and only discussing the scope of reconstruction services it was under contract to perform for the Beans. Therefore, CWFR argues, its conduct does not meet the statutory definition of "public adjuster."

¶ 26    Before we can discuss whether CWFR was acting as a public adjuster, we must clarify that its contract with Matthew was not separated into two contracts: one for mitigation and another for reconstruction. Rather, the contract was a "Mitigation & Repair Work Authorization," and the "Scope of Work" articulated in the contract reads as follows:

"Each of Customer and [CWFR] hereby agree to the terms and conditions of this

*Mitigation and Repair Work Authorization* \*\*\*, as further described will document damages, perform 3D scanning, obtain moisture readings, remove affected materials, disinfect, install and remove equipment and repair affected areas \*\*\* and such services shall include without limitation, *mitigation and repair services* set forth in the Xactimate invoice created by [CWFR] \*\*\* plus any other agreed upon material or services by the Customer and [CWFR] as set forth in any change order \*\*\* or other document, and all such contracts are hereby incorporated into this Contract \*\*\*. (Emphases added.)

In its amended complaint to foreclose the mechanics lien, as well as in its brief to this court, CWFR states that it

"provides mitigation and reconstruction services to customers who have experienced damage following a fire at their property. Mitigation services are emergency services designed to prevent further damage following a loss. In the case of a fire loss, mitigation services include applying odor counteractants, cleaning and removing (as appropriate) affected surfaces, HEPA vacuuming, and running hydroxyl generators and air scrubbers. *Reconstruction work, in the case of* a *fire loss, involves repairing the damage* caused by the fire and returning the property to its pre-loss condition." (Emphasis added.)

¶ 27    Traditional contract interpretation principles in Illinois require that

" 'an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)).

This approach is sometimes referred to as the "four corners" rule. *Air Safety, Inc.*, 185 Ill. 2d at

462. In applying this rule, a court initially looks to the language of a contract alone. *Id.* If the language of the contract is facially unambiguous, then the contract is interpreted by the court as a matter of law, without the use of parol evidence. *Id.* Parol evidence may be used only to aid the court to resolve an ambiguity when the language of the contract is susceptible to more than one meaning. *Id* at 462-63.

¶ 28    We can find no ambiguity in the language of the contract between CWFR and Matthew. Indeed, CWFR does not argue that there is any such ambiguity. Instead, CWFR argues that the plain language of the contract describing the scope of work does not concern public adjusting. Further, during oral argument, CWFR asked this court to interpret its actions under the contract as strictly an attempt to collect for the mitigation work that it had already completed. Our supreme court has stated:

> " 'When parties sign a memorandum expressing all the terms essential to a complete agreement they are to be protected against the doubtful veracity of the interested witnesses and the uncertain memory of disinterested witnesses concerning the terms of their agreement, and the only way in which they can be so protected is by holding each of them conclusively bound by the terms of the agreement as expressed in the writing.' " *Air Safety, Inc.*, 185 Ill. 2d at 464 (quoting *Armstrong Paint & Varnish Works v. Continental Can Co.*, 301 Ill. 102, 106 (1921)).

We do not view the contract as divisible agreements for mitigation and reconstruction. We will interpret it as a unified agreement, applying the "four corners" rule, and not in the separate, piecemeal fashion CWFR prefers.

¶ 29    The Insurance Code contains two provisions relevant to this issue in the present appeal, the Public Adjusters Law (215 ILCS 5/1501 *et seq.* (West 2018)) and the adjusters and firms statute

(215 ILCS 5/512.51 (West 2018)). Section 1510 of the Public Adjusters Law defines "Public Adjuster" as

"any person who, for compensation or any other thing of value on behalf of the insured:

(i) acts or aids, solely in relation to first party claims arising under insurance contracts that insure the real or personal property of the insured, on behalf of an insured in adjusting a claim for loss or damage covered by an insurance contract;

(ii) advertises for employment as a public adjuster of insurance claims or solicits business or represents himself or herself to the public as a public adjuster of first party insurance claims for losses or damages arising out of policies of insurance that insure real or personal property; or

(iii) directly or indirectly solicits business, investigates or adjusts losses, or advises an insured about first party claims for losses or damages arising out of policies of insurance that insure real or personal property for another person engaged in the business of adjusting losses or damages covered by an insurance policy for the insured." 215 ILCS 5/1510 (West 2018).

Similarly, section 512.52(a) of the adjusters and firms statute defines adjusting insurance claims as

"representing an insured with an insurer for compensation, and while representing that insured either negotiating values, damages, or depreciation, or applying the loss circumstances to insurance policy provisions." 215 ILCS 5/512.52(a) (West 2018).

Section 1515(a) of the Public Adjusters Law states that

"[a] person shall not act, advertise, solicit, or hold himself out as a public adjuster or to be in the business of adjusting insurance claims in this State, nor attempt to obtain a contract for public adjusting services, unless the person is licensed as a public adjuster in accordance with this Article." 215 ILCS 5/1515(a) (West 2018).

Section 512.53(a) of the adjusters and firms statute provides that

"[n]o person may engage in the business of adjusting insurance claims, nor advertise, solicit or hold himself out to be in the business of adjusting insurance claims, solicit or hold himself out to be a Public Insurance Adjuster, nor attempt to obtain a contract for Public Adjusting services, unless licensed or registered in accordance with the provisions of this Article ***." 215 ILCS 5/512.53(a) (West 2018).

Section 1605 of the Public Adjusters Law states that

"[a]ny person who acts as or holds himself out to be a public adjuster without holding a valid and current license to do so is hereby declared to be inimical to the public welfare and to constitute a public nuisance." 215 ILCS 5/1605 (West 2018).

Section 1610 of the Public Adjusters Law provides that

"[i]n addition to any other penalty set forth in this Article, any person violating Section 1605 of this Code shall be guilty of a Class A misdemeanor ***." 215 ILCS 5/1610 (West 2018).

Section 512.53(b) of the adjusters and firms statute provides that

"[i]n addition to any other penalty set forth in this Article, any person violating paragraph (a) of this Section shall be guilty of a Class A misdemeanor ***." 215 ILCS 5/512.53(b) (West 2018).

Section 512.53(c) of the adjusters and firms statute provides that

"[a]ll contracts entered into by any person violating subsection (a) of this Section are void and invalid." 215 ILCS 5/512.53(c) (West 2018).

¶ 30    Before further examining CWFR's actions under the language of the Insurance Code, it is important to reiterate here that the e-mails attached to the Beans' motion to dismiss pursuant to section 2-619(a)(9) of the Code were authenticated by an affidavit from Maurissa in accordance with Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013). There is nothing in the record to indicate that CWFR challenged or objected to the affidavit in any way. CWFR admitted in an amended response to a request to admit that the e-mails were "true, correct, and genuine copies of e-mail [*sic*] sent by CWFR to Maurissa." In the context of ruling on a motion to dismiss under section 2-619, when supporting affidavits have not been challenged or contradicted by counteraffidavits or other appropriate means, the facts stated therein are deemed admitted. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 262 (2004). As such, Maurissa's affidavit authenticating the e-mails exchanged between herself and CWFR must be taken as true.

¶ 31    We hold that the record presented shows that CWFR was acting as a public adjuster as defined in both section 1510 of the Public Adjusters Law and section 512.52(a) of the adjusters and firms statute. See *supra* ¶ 26. Regarding Maurissa's question as to how CWFR is paid by Lutheran Mutual, Drake answered via the e-mail from March 3, 2020, at 1:27 p.m., that, in pertinent part

> "[o]nce the repair estimate is complete we will send a copy to you via e-mail and submit the estimate directly to Lutheran Mutual. *We work with your insurance company to reach an agreed price on the scopes so that when we do move forward with the rebuild, you are only financially responsible for your deductible.*" (Emphasis added.)

Drake, in that same e-mail, told Maurissa, in pertinent part:

"If you would like to provide us with a copy of the scope that Lutheran Mutual wrote based off their inspection of your home, we find that this tends to help expedite the agreement process as we are able to pinpoint any major discrepancies and *negotiate on your behalf to reconcile.*" (Emphasis added.)

When Maurissa asked CWFR's Stricker on March 3, 2020, at 3:42 p.m. if the Beans would "have to pay anything out of pocket besides the deductible," Stricker responded on March 4, 2020, at 8:29 a.m. as follows:

"Okay so the mitigation side (fire clean up) *we bill after *** the work is complete and negotiate with the insurance company to come to a mutual agreement.* The reconstruction side (replacing anything that was removed) is sent to insurance prior to the rebuild work beginning. *We do this so that we are in agreement with price and scope before the work is completed, leaving only the deductible as the out-of-pocket expense.*" (Emphases added.)

In addressing Maurissa's concerns about insurance coverage versus the costs charged by CWFR, she received the following from Veldman, production manager with CWFR, at 5:28 p.m. on March 11, 2020. Pertinent here:

"*That leaves your insurance company responsible for indemnifying you of any 'fair and reasonable' costs associated with the loss, minus the above-mentioned deductible*, in order to get the home back to pre-loss condition. I put quotes on that because there are occasions where a contractor and an insurance company may have different opinions on fair and reasonable. That is generally where I, or someone on my team, come in. It's not all that uncommon for 2 people to view the same loss differently. In these instances, it is standard for the adjuster to review a contractors invoice and mark a few things that he/she

may consider unnecessary or 'overkill' as they say. *We would then either justify our decision and supply supporting documentation*, from our continuing education on industry norms, or *forfeit/alter those charges to come to an agreement with the adjuster.*" (Emphases added.)

The e-mails above confirm that CWFR was acting in relation to a first party insurance claim on behalf of the Beans, as opposed to a policyholder attempting to assert its own rights under the policy. Such acts are defined as those of a "public adjuster" in section 1510 of the Public Adjusters Law. See 215 ILCS 5/1510 (West 2018). Additionally, the record and CWFR's own pleadings show that it was engaged in these actions in exchange for the assignment of the Beans' rights under the Lutheran Mutual policy. In other words, its acts as a public adjuster were done "for compensation or any other thing of value on behalf of the insured." 215 ILCS 5/1510 (West 2018).

¶ 32    In addition to the e-mails referenced above (*supra* ¶¶ 30-31), CWFR negotiated values and damages on behalf of the Beans. In her March 3, 2020, 1:55 p.m. e-mail to Maurissa answering her concerns as to how CWFR's mitigation services would be paid for, Drake responded, in pertinent part:

> "*The mitigation invoice will be finalized within 5-7 business days of the final equipment pick up and submitted to Lutheran Mutual. Any discrepancies will be negotiated by our In House Mitigation Estimator* and when an agreement has been reached, payment is typically issued directly to our company as it is for services rendered." (Emphasis added.)

After acknowledging to Maurissa CWFR's receipt of a forwarded e-mail from LJ Shaw, Drake wrote to her on March 9, 2020, at 10:03 a.m. that "Estimator Derrick" would review and

> "*will then be pinpointing any major discrepancies and reaching out to adjuster Paul* [(of LJ Shaw)] *to negotiate and reconcile.*" (Emphasis added.)

Stricker responded on March 11, 2020, at 4:41 p.m. to Maurissa's concerns about paying over and above the Beans' deductible with:

> "*There is coverage for the loss, we just need to get to a mutual agreement with your carrier as what that amount is*." (Emphasis added.)

Returning to Veldman's March 11, 2020, e-mail to Maurissa at 5:28 p.m., he attempted to alleviate her concerns regarding the discrepancy between CWFR's mitigation invoice and LJ Shaw's assessment of the claim with:

> "I have personally worked with LJ Shaw on numerous claims, and I cannot think of an instance where we couldn't come to an agreement that appeased all parties involved. I have confidence that your file will be no different. *Our office will work with the adjuster on getting our representative onsite at the same time to make this happen*." (Emphasis added.)

CWFR's own words in these e-mail exchanges depict what section 512.52(a) of the adjusters and firms statute defines as adjusting insurance claims. CWFR explicitly and continually reiterates that it was representing the Beans with an insurer for compensation (see *supra* ¶ 29) and, while engaged in the representation, negotiating values and damages. See 215 ILCS 5/512.52(a) (West 2018).

¶ 33    Further illustrating CWFR's actions as a public adjuster within the definition in section 512.52(a) of the adjusters and firms statute, Stricker responded to Maurissa's concern regarding paying over and above the Beans' deductible with:

> "The mitigation cost is not finalized yet but *I can tell you that if this is the answer your carrier is giving you, you might want to ask for a different adjuster or the current adjuster's supervisor. [LJ Shaw] doesn't seem to be handling this claim in good faith*. We are estimating work that needs to be completed to get your home back to pre-loss condition

and *if [LJ Shaw] is that far apart from us, something is wrong. Perhaps ask how much your coverage limits are? If coverage limits are above our amounts, there is no reason that [LJ Shaw] shouldn't be able and willing to work with us to get to a mutual agreement.* We will know more once the mitigation amount is finalized and Derrick looks at [LJ Shaw's] estimate. *In the meantime, find out the coverage limits for this loss/policy coverage.*" (Emphases added.)

After Maurissa asked why CWFR could not assess the Beans' insurance coverage limits, Stricker responded at 8:40 a.m. on March 10, 2020, with:

"When it comes to super specific policy details, carriers typically won't give a third party that information. *We obviously know this a covered loss.*" (Emphasis added.)

Again, CWFR is explicitly acting as a public adjuster per section 512.52(a) of the adjusters and firms statute by "applying the loss circumstances to insurance policy provisions." 215 ILCS 5/512.52(a) (West 2018). In addition to all the e-mail exchanges articulated above, CWFR's Xactimate estimate listed "Vinnie Guaderrama" as the "Claim Rep" and "General Executive Adjuster." Guaderrama sent Maurissa an e-mail with the signature line claiming him to be in possession of "Illinois Public Adjuster License No. 018068229."

¶ 34    There is no question that CWFR was acting as a public adjuster within the definitions in the relevant parts of the Insurance Code. We now must examine the effect of CWFR's actions as a public adjuster on the contract with the Beans, as well as the assignment of rights to the Beans' insurance policy.

¶ 35    CWFR admitted in the underlying proceedings that it did not possess a valid Illinois public adjusters license at all times relevant to this matter. That fact combined with its actions described above within the definition of a public adjuster under the relevant parts of the Insurance Code

would place CWFR in violation of section 1515(a) of the Public Adjusters Law as well as section 512.53(a) of the adjusters and firms statute. See 215 ILCS 5/1515(a) (West 2018); see also 215 ILCS 5/512.53(a) (West 2018). Further, violation of these sections of the Insurance Code renders its contract with Matthew "void and invalid." See 215 ILCS 5/512.53(c) (West 2018).

¶ 36    " 'In Illinois, when a statute declares that it shall be unlawful to perform an act and imposes a penalty for its violation, contracts for the performance of an act are void and incapable of enforcement.' " *Aste v. Metropolitan Life Insurance Co.*, 312 Ill. App. 3d 972, 980 (2000) (quoting *Broverman v. City of Taylorville*, 64 Ill. App. 3d 522, 526 (1978)).

> " 'As a general rule courts will not enforce a contract involving a party who does not have a license called for by legislation that expressly prohibits the carrying on of the particular activity without a license where the legislation was enacted for the protection of the public, not as a revenue measure.' " *Aste*, 312 Ill. App. 3d at 980 (quoting *Ransburg v. Haase*, 224 Ill. App. 3d 681, 684-85 (1992)).

¶ 37    In *Aste*, the plaintiff-executor sued the defendant-securities salesperson (Williams), alleging breach of fiduciary duty, constructive fraud, and negligence related to financial dealings with the decedent. *Id.* at 974. The plaintiff's complaint averred that Williams contacted the decedent for the purpose of selling investment products offered by the defendants Metropolitan Life Insurance Company and MetLife Securities (MetLife). *Id.* Williams could not assist the decedent with a transfer of assets to MetLife from another company without the participation of a registered securities salesperson (Dooley) from MetLife, as he did not possess such a securities license. *Id.*

¶ 38    Williams contacted the decedent to solicit her use of MetLife's estate planning services. *Id.* at 975. Williams prepared an estate analysis report for the decedent, and Dooley executed a

MetLife "customer profile" form that stated her investment and tax objectives. *Id.* Dooley was not registered as a securities salesperson at the time the "customer profile" was executed. *Id.* After Dooley transferred $212,000 from the decedent's Merrill Lynch federal securities trust to various accounts at MetLife, Williams received a loan from the decedent to open a tavern. *Id.* The decedent gave Williams a $70,000 loan to start the business, followed by three additional checks for $55,000, $55,000, and 27,000. *Id.* The plaintiff's suit was based on these transactions. However, the trial court granted Metropolitan Life Insurance Company and MetLife's motion to compel arbitration based on an arbitration clause contained in the "customer profile" executed by the decedent and MetLife. *Id.*

¶ 39     On appeal, the *Aste* court found that the "customer profile" was executed by Dooley when he was not registered to sell securities under the Illinois Securities Law of 1953 (Securities Law) (815 ILCS 5/1 *et seq.* (West 1992)). The court reasoned that the legislative intent of the Securities Law was the " 'protection of the public from unscrupulous stock promoters' " and " '[r]egistration with *** the Secretary of State is the primary safeguard.' " *Aste*, 312 Ill. App. 3d at 976 (quoting *Martin v. Orvis Brothers & Co.*, 25 Ill. App. 3d 238, 244-45 (1974)). The law also contained a provision wherein it was a violation for a person to " 'act as a *** salesperson *** unless registered as such.' " *Id* at 977 (quoting 815 ILCS 5/12(C) (West 1992)). Violation of that provision was characterized by the law as " 'a Class A misdemeanor.' " *Id*. (quoting 815 ILCS 5/14(A) (West 1992)). In reversing the trial court's order compelling arbitration, the *Aste* court found that the "customer profile" was not a valid contract and declared it void because Dooley's lack of registration as a securities salesperson was a violation of the Securities Law and held:

> "[T]he customer profile which contains the arbitration agreement is an integral part of the
> solicitation effort of the salesperson which the Securities Law seeks to regulate through its

registration requirements. Thus, to the extent that the salesperson who procured the customer profile was not registered (or lacked a license) the product of his solicitation, including the customer profile which he obtained, cannot be recognized." *Id.* at 982.

¶ 40 Returning to the present case and examining the statutory language as recited above (*supra* ¶ 29), both section 1515(a) of the Public Adjusters Law and section 512.53(a) of the adjusters and firms statute forbid engaging in the business of adjusting or holding oneself out to be in the business of adjusting insurance claims without a valid license. See 215 ILCS 5/1515(a) (West 2018); see also 215 ILCS 5/512.53(a) (West 2018). Based on our foregoing analysis, we conclude that CWFR was in violation of both statutes.

¶ 41 CWFR's contract with Matthew is not a valid contract for the same reasons articulated in *Aste*. Both statutes at issue here express a public policy requiring any person engaged in adjusting public insurance claims to have the proper license in order to protect the public. Indeed, both statutes contain provisions making their violation a Class A misdemeanor. 215 ILCS 5/1610 (West 2018); 215 ILCS 5/512.53(b) (West 2018). The very language in the Public Adjusters Law declaring a violation of section 1515(a) "to be inimical to the public welfare and to constitute a public nuisance" (215 ILCS 5/1605 (West 2018) indicates such a legislative intent. Further, the plain language of section 512.53(c) of the adjusters and firms statute renders contracts entered by a person in violation of the law "void and invalid." 215 ILCS 5/512.53(c) (West 2018). Therefore, we hold that CWFR's contract with Matthew, and the resulting assignment of rights to the Lutheran Mutual policy, to be void, invalid, and unenforceable.

¶ 42 We now move on to our analysis of the effect the invalid contract and assignment has on CWFR's claims in counts I to VII of its amended complaint.

¶ 43 Count I of CWFR's complaint, directed at the Beans and Caliber, sought foreclosure on

the mechanic's lien pursuant to the Mechanics Lien Act (770 ILCS 60/0.01 *et seq* (West 2018)). The Mechanics Lien Act assumes a valid contract exists between the parties. See 770 ILCS 60/11(a) (West 2018). Therefore, the legal capacity to foreclose a mechanic's lien depends upon the validity of the lien. *G.M. Fedorchak & Associates, Inc. v. Chicago Title Land Trust Co.*, 355 Ill. App. 3d 428, 433 (2005) (citing *Pascal P. Paddock, Inc. v. Glennon*, 32 Ill. 2d 51 (1964)). The lien, in turn, " 'must be based upon a valid contract, and in its absence the lien is unenforceable.' " *G.M. Fedorchak*, 355 Ill. App. 3d at 433 (quoting *Paddock*, 32 Ill. 2d at 53).

¶ 44    Without a valid contract, the CWFR's mechanic's lien is unenforceable. As such, the trial court's dismissal of count I of the amended complaint pursuant to section 2-619(a)(9) of the Code was not in error.

¶ 45    Count II alleged breach of contract against the Beans. Again, having found that the contract between CWFR and the Beans was void and invalid, a claim for breach of that void and invalid contract must also fail.

¶ 46    Count III asserted a claim of *quantum meruit* against the Beans. However, CWFR's engagement as an unlicensed public adjuster is "inimical to the public welfare and *** a public nuisance." 215 ILCS 5/1605 (West 2018). The invalidity of a contract precludes obtaining relief on a *quantum meruit* theory when the invalidity was due to a violation of public policy. See *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 366 (1997). As CWFR's contract with Matthew is void per the relevant sections of the Insurance Code for, amongst other things, being against public policy, its *quantum meruit* claim is of no merit.

¶ 47    Count IV, directed against Lutheran Mutual, also fails. Because there was no valid assignment of benefits under the policy from Matthew to CWFR, CWFR cannot maintain a breach of contract action against Lutheran Mutual. The dismissal of count IV was not error.

2022 IL App (2d) 210043

¶ 48　Similarly, without a valid assignment of benefits under the policy, the asserted claim in count V for bad faith under section 155(1)(a)-(c) of the Insurance Code against Lutheran Mutual was also properly dismissed. Section 155(1) of the Insurance Code provides:

> "(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> > (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
> >
> > (b) $60,000;
> >
> > (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." 215 ILCS 5/155(1)(a)-(c) (West 2018)

The remedy embodied in section 155 of the Insurance Code extends only to the party insured and policy assignees. *Yassin v. Certified Grocers of Illinois, Inc.*, 133 Ill. 2d 458, 466 (1990). The remedy in section 155 of the Insurance Code does not extend to third parties. *Yassin*, 133 Ill. 2d at 466. Again, without a valid assignment of benefits under the policy, CWFR has no claim under section 155 of the Insurance Code. There was no error in dismissing count V of the complaint.

¶ 49　We now come to count VI, against LJ Shaw for tortious interference with prospective business advantage. To prevail on such a claim, a plaintiff must prove: (1) its reasonable

expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991). Here, CWFR cannot overcome the first element to maintain this cause of action.

¶ 50   It is axiomatic that CWFR could not have a reasonable expectation of entering a valid business relationship based on a void and invalid contract when the contract's invalidity renders it "inimical to the public welfare" (215 ILCS 5/1605 (West 2018)) and CWFR is potentially criminally responsible for engaging in unlicensed public adjusting. Count VI of the amended complaint was properly dismissed by the trial court.

¶ 51   Count VII asserted a claim of tortious interference with contract against LJ Shaw. The elements of such a claim are (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989). It is once again the first element of the claim that CWFR cannot overcome. As we have discussed to great length, no valid and enforceable contract existed between CWFR and any other defendant. Count VII was properly dismissed.

¶ 52   Before summarizing our holding, we must address CWFR's argument that it should have been permitted to depose Maurissa for the purpose of eliciting her understanding that CWFR was not serving as her public adjuster. Attached to CWFR's response to defendants' motions to dismiss was a declaration of Trevor Madera, operations manager for CWFR, wherein he avers:

"Were CWFR to depose [Maurissa], it suspects she would confirm that CWFR personnel never provided—or attempted to provide—public adjusting services to her. CWFR further suspects [Maurissa] would acknowledge that she never heard or saw CWFR personnel negotiate, attempt to negotiate, or promise to negotiate with Lutheran Mutual or LJ Shaw for any account other than CWFR's own account."

CWFR claims here that it was reversible error for the trial court not to permit CWFR to procure Maurissa's testimony through deposition before ultimately dismissing counts I through VII of its amended complaint. We disagree.

¶ 53    Rule 191 requires that affidavits must be made on personal knowledge; set forth with particularity the facts upon which the claim, counterclaim, or defense is based; and shall not consist of conclusions but of facts admissible in evidence. Ill. S. Ct. R. 191 (eff. Jan. 4, 2013). "[W]here the averments made in a plaintiff's affidavit are premised upon information and belief, they are insufficient as against positive averments of facts made in an opposing defendant's affidavit." *Luciano v. Waubonsee Community College*, 245 Ill. App. 3d 1077, 1084 (1993).

¶ 54    CWFR established the validity of the e-mails in its amended response to a request to admit. It admitted that the e-mails were "true, correct, and genuine copies of e-mail [*sic*] sent by CWFR to Maurissa." Maurissa's unchallenged affidavit also established the validity of the e-mails. Madera's declaration does not dispute the validity of the e-mails but asserts that CWFR "suspects" Maurissa would testify that she did not believe it to be her public adjuster. Madera's declaration of his suspicions as to what Maurissa would testify to is insufficient to contradict the established validity of the e-mails and Maurissa's affidavit. In any event, the record is devoid of the trial court's refusal to permit the deposition of Maurissa. It is further devoid of any notice or motion from CWFR seeking to take her deposition.

¶ 55 To summarize, defendants established that CWFR was engaged in unlicensed public adjusting, through the submitted e-mails and unchallenged affidavit of Maurissa, raising an affirmative matter under section 2-619(a)(9) of the Code to negate the claims alleged in counts I through VII of CWFR's amended complaint. In response, CWFR failed to establish that the affirmative matter required the resolution of any issue of material fact. The trial court's dismissal of counts I through VII of CWFR's amended complaint was not in error.

¶ 56                    III. CONCLUSION

¶ 57 For the reasons stated, we affirm the judgment of the circuit court of Kane County dismissing counts I through VII of CWFR's amended complaint pursuant to section 2-619(a)(9) of the Code.

¶ 58 Affirmed.

**No. 2-21-0043**

| | |
|---|---|
| **Cite as:** | *Power Dry of Chicago, Inc. v. Bean*, 2022 IL App (2d) 210043 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CH-250; the Hon. James R. Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | Fitzgerald T. Bramwell, of Chicago, for appellant. |
| **Attorneys for Appellee:** | James J. Ryan, of Jendryk, Hamer & Begley, LLC, of Wheaton, for appellees Matthew Bean and Maurissa Bean.<br><br>Janella L. Barbrow and Mark T. Schmidt, of Schmidt & Barbrow, P.C., of Wheaton, for appellees Lutheran Mutual Fire Insurance Company and L.J. Shaw & Company.<br><br>Simon M. Feng, of Perkins Coie LLP, of Los Angeles, California, for appellee Caliber Home Loans, Inc.<br><br>No brief filed for other appellee. |